STATE OF CONNECTICUT *v.* JOSEPH KROZEL

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE NO. MV 12-7131

*(One judge dissenting)*

Argued October 26, 1962—decided March 5, 1963

*Irwin I. Krug,* of Willimantic, for the appellant (defendant).

*James D. Mirabile,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J.   We are asked to reverse under the sixth amendment to the Constitution of the United States, which corresponds closely to article first,

§ 9, of the constitution of this state, a conviction upon a charge of operating a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227 of the General Statutes.

The finding, with such corrections as the defendant is entitled to (Cir. Ct. Rule 7.26.1), sets forth these facts: On July 20, 1962, at about 10:50 p.m., state police trooper Robert Hubbard, assigned to cruiser duty, was patrolling route 6 in the town of Andover. Near the intersection of route 6 and Hebron Road, his attention was drawn to a tie-up in traffic caused by the operation of a green Chevrolet car which was proceeding very slowly in an easterly direction on route 6 and which, upon a blast from the police siren, came to a stop on Old State Road. The accused was the operator of the green automobile. He was taken in the cruiser to the state police barracks in Colchester, where trooper Hubbard and another police officer administered the sobriety tests which are routinely made in such cases. They concluded that he was under the influence of intoxicating liquor and so charged him. He was then placed in the lockup. He asked permission to use the telephone to call his lawyer. This request was denied. He later asked permission to call his wife. This request, too, was denied.[1] The

[1] In cross-examination of the arresting officer, he testified as follows: "Q.—Then after you were all through [with the examination] he asked you to use the phone, didn't he? A.—He might have. I don't honestly remember. Q.—And you refused permission, didn't you? A.—Most likely; I locked him up after we were finished. Q.—Did he want to use the phone? Did he ask you, and did you refuse permission? A.—I don't exactly remember, but I mean I know I didn't let him use the phone at that time. Q.—Why didn't you let him use the phone? A.—Normally when someone is in an intoxicated condition we lock him up for four hours and then bond him out. Q.—The man was capable of using the phone. Didn't he tell you that he wanted to call his lawyer and wanted to call his wife? A.—Well, he probably did. I can't honestly say." The defendant, on direct examination, testified: "Q.—Then what was the conversation before you were locked up? A.—I asked him

trial court found that the "defendant was capable of using the telephone." He was released from custody, upon the posting of a bond, at 8 a.m. on the following day. In its corrected finding, the trial court made this specific finding: "The State Police policy is to lock up an accused for four hours before releasing him on bond and to deny him access to a telephone during the time when he is, in the opinion of the police, intoxicated." We can assume from the evidence that this policy of the state police was followed in this case.

The question raised on this appeal is: At what stage of the criminal process does the accused have the right to secure the assistance of his lawyer, where he is able to pay for and asks for legal assistance?

In the United States, defendants were, from earliest times, allowed to be represented by retained counsel, and the provisions in the bill of rights and in state constitutions confirmed that practice. Beaney, "Right to Counsel before Arraignment," 45 Minn. L.R. 771, 772. "The original Constitution of Connecticut (Art. I, § 9) contained a provision that 'In all criminal prosecutions, the accused shall have the right to be heard by himself and by counsel'; but this constitution was not adopted until 1818. However, it appears that the English common law rule had been rejected . . . long prior to 1796." *Sutherland, J.,* in *Powell* v. *Alabama,* 287 U.S. 45, 62, referring to 2 Swift, System, p. 398. In *Powell* v. *Alabama,* supra, the following extended quotation appears in the footnote (p. 63): "This [Swift's System] ancient work, consisting of six books, has long been out of print. A copy of it is preserved in the locked files of the Library of

[arresting officer] if he wouldn't let me call my attorney. He said 'No.' I said, 'Then let me call my wife.' He said, 'No. You are not using the phone at all.' "

Congress. The following extract from the pages cited is both interesting and instructive: 'The attorney for the state then proceeds to lay before the jury, all the evidence against the prisoner, without any remarks or arguments. The prisoner by himself or counsel, is then allowed to produce witnesses to counteract and obviate the testimony against him; and to exculpate himself with the same freedom as in civil cases. We have never admitted that cruel and illiberal principle of the common law of England that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence, which are allowed, when the most trifling pittance of property is in question. The flimsy pretence, that the court are to be counsel for the prisoner will only heighten our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defence. This doctrine might with propriety have been advanced, at the time when by the common law of England, no witnesses would be adduced on the part of the prisoner, to manifest his innocence, for he could then make no preparation for his defence. One cannot read without horror and astonishment, the abominable maxims of law, which deprived persons accused, and on trial for crimes, of the assistance of counsel, except as to points of law, and the advantage of witnesses to exculpate themselves from the charge. It seems by the ancient practice, that whenever a person was accused of a crime, every expedient was adopted to convict him, and every privilege denied him, to prove his innocence. . . . Our ancestors, when they first enacted their laws respecting crimes, influenced by the illiberal principles which they had imbibed in their native country, denied counsel to prisoners to plead for them to any thing but points

of law. It is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered. The legislature has become so thoroughly convinced of the impropriety and injustice of shackling and restricting a prisoner with respect to his defence, that they have abolished all those odious laws, and every person when he is accused of a crime, is entitled to every possible privilege in making his defence, and manifesting his innocence, by the instrumentality of counsel, and the testimony of witnesses.' " Mr. Justice Sutherland thought (p. 64 n.) that the "early statutes of Connecticut, upon examination, do not seem to be as clear as this last paragraph would indicate; but Mr. Swift, writing in 1796, was in a better position to know how the statutes had been interpreted and applied in actual practice than the reader of today; and we see no reason to reject his statement." In Connecticut, an accused enjoyed the full right to retain counsel of his own choice. Beaney, The Right to Counsel in American Courts, p. 21 (1955). Such has ever since been the policy of this state.[2]

We now turn to a review of some of the recent right-to-counsel cases. Thirty years ago, in *Powell* v. *Alabama,* supra, the Supreme Court of the United States advanced the American view of the right to counsel in criminal cases (p. 68): "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . *He requires the guiding hand of counsel at every step*

---

[2] Connecticut's generous treatment of those accused of crime is evidenced by the fact that "[o]nly 78 Public Defender offices are currently in operation in the entire country and of this number 63 are located in three states—California, Connecticut and Illinois." Pollock, Equal Justice in Practice, 45 Minn. L.R. 737, 738.

*in the proceedings against him."* (Italics supplied.)
In *Chandler* v. *Fretag,* 348 U.S. 3, 9, the petitioner
was indicted in a Tennessee court for housebreak-
ing and larceny, punishable by a term of three to
ten years. At the trial, he appeared without counsel
and pleaded guilty. He was then advised for the
first time that, because of three prior felony convic-
tions, he would be tried also as a habitual criminal.
A conviction on that charge would have subjected
him to life imprisonment. He asked for a continu-
ance so that he could obtain counsel. This request
was denied and he was convicted. After serving his
sentence on the original charge, he unsuccessfully
sought habeas corpus in the state courts, claiming
denial of the opportunity to obtain counsel. The
Supreme Court of the United States granted certi-
orari and reversed. The Tennessee attorney gen-
eral insisted that the petitioner had no federal right
to counsel, relying upon *Betts* v. *Brady,* 316 U.S.
455, which permits a trial of a noncapital offense
without counsel where the defendant is confronted
by a relatively simple charge and is reasonably in-
telligent and experienced, and no injustice is done.
The court rejected this argument, holding (p. 9)
that the doctrine enunciated in *Betts* v. *Brady,*
supra, "has no application here." The court quoted
at length from *Powell* v. *Alabama,* supra, and con-
cluded (p. 9): "Regardless of whether petitioner
would have been entitled to the appointment of
counsel, *his right to be heard through his own coun-
sel was unqualified."* (Italics supplied.)

But does the "unqualified" right recognized in
*Chandler* v. *Fretag,* supra, extend to the pretrial
state? This problem was more clearly presented
in two cases which were decided at the 1958 term
of the Supreme Court. In both cases, the claim
to the right to counsel during the period of police
interrogation was denied. In *Crooker* v. *California,*

357 U.S. 433, 440, a college graduate, thirty-one years old, with one year of law school training, confessed to the murder of his paramour. During the interrogation, he asked at least twice if he could call an attorney, but was told he could do so only at the conclusion of the investigation. Mr. Justice Clark's opinion for the court, after finding the confession voluntary, rejected petitioner's contention that (p. 440) "every state denial of a request to contact counsel . . . [is] an infringement of the constitutional right *without regard to the circumstances of the case.*" Rather, the court concluded (p. 439): "[S]tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits . . . but also if he is deprived of counsel for any part of the pretrial proceedings, provided . . . he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.' . . . The latter determination necessarily depends upon all the circumstances of the case." In that case (p. 440), "the sum total of the circumstances . . . during the time petitioner was without counsel is a voluntary confession by a college-educated man with law school training who knew of his right to keep silent." Mr. Justice Douglas' dissenting opinion, joined by Chief Justice Warren and Justices Black and Brennan, after pointing out the various functions of counsel at the pretrial stage, ends on this clear note (p. 448): "The demands of our civilization expressed in the Due Process Clause require that the accused who wants a counsel should have one at any time after the moment of arrest." In a companion case, *Cicenia* v. *Lagay,* 357 U.S. 504, 511, petitioner was denied an opportunity during a period of police questioning to confer with a lawyer whom he had already retained, rather than,

as in the *Crooker* case, supra, a lawyer not yet retained. A period of seven and one-half hours had elapsed between the time of the lawyer's request to see his client and the granting of access. Mr. Justice Harlan, writing for the court, found no lack of fundamental fairness, and reiterated that lack of counsel is only one pertinent element in determining whether a trial is unfair. In evaluating the precedential value of the court's decisions in these cases, it should be noted that Mr. Justice Stewart has since replaced Mr. Justice Burton, who voted with the majority. Mr. Justice Stewart, in *Spano* v. *New York,* 360 U.S. 315, 326, wrote a separate concurring opinion placing reversal of conviction squarely on the failure of the police to allow petitioner to send for counsel and distinguished the *Crooker* and *Cicenia* cases on the ground that in the *Spano* case the petitioner was already under indictment so that it was (p. 327) "not a case where the police were questioning a suspect in the course of investigating an unsolved crime." Moreover, he used language which casts some doubt on the longevity of *Crooker* and *Cicenia* even as so qualified (p. 327): "Our Constitution guarantees the assistance of counsel to a man on trial for his life in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law. Surely a Constitution which promises that much can vouchsafe no less to the same man under midnight inquisition in the squad room of a police station."

Perhaps in no area of judicial administration are the judges so directly aware of the conflicting interests involved as in the right-to-counsel cases. "On the one hand, it is indisputable that the right to counsel in criminal cases has a high place in our scheme of procedural safeguards. On the other hand, it can hardly be denied that . . . [to] con-

strict state police activities . . . might impair their ability to solve difficult cases. A satisfactory formula for reconciling these competing concerns is not to be found in any broad pronouncement that one must yield to the other in all instances. Instead, . . . this Court, in judging whether state prosecutions meet the requirements of due process, has sought to achieve a proper accommodation by considering a defendant's lack of counsel one pertinent element in determining from all the circumstances whether a conviction was attended by fundamental unfairness." *Harlan, J.,* in *Cicenia* v. *Lagay,* 357 U.S. 504, 509. There are those who strongly contend that "[a] person accused of crime needs a lawyer right after his arrest probably more than at any other time." Chafee, Documents on Fundamental Human Rights, pamphs. 1-3, p. 541 (1951-1952), cited by *Douglas, J.,* dissenting in *Crooker* v. *California,* supra, 446; Moreland, Modern Criminal Practice, p. 175 (1959); Orfield, Criminal Procedure from Arrest to Appeal, p. 43 (1947). "What takes place in the secret confines of the police station may be more critical than what takes place at the trial." Note, 107 U. Pa. L. Rev. 286.

In the case at bar, unlike *Crooker* and *Cicenia,* the interrogation of the defendant had been concluded. All the reasonable demands of the police had been satisfied. The charge against him was made out. (See *Spano* v. *United States,* supra.) The fact that this was a noncapital offense is of no moment. "Indeed the right to the assistance of counsel whom the accused has himself retained is absolute, whatever the offense for which he is on trial." *Stewart, J.,* concurring in *Spano* v. *United States,* supra, 327. Unquestionably, the defendant was entitled to have effective counsel at the trial. *Powell* v. *Alabama,* supra. "Although competent counsel is of great value at that time, the time when

the accused person really needs the help of a lawyer is when he is first arrested and from then on until trial. The intervening period is so full of hazards for the accused person that he may have lost any legitimate defense long before he is arraigned and put on trial." Miller, "Lawyers and the Administration of Criminal Justice," 20 A.B.A.J. 77, 78. "The question here is how they could ever have had effective counsel at the trial . . . . They were denied effective counsel at the trial itself because of what went on before trial while the defendants were without counsel, and absolutely under the control of the prosecution." *Ex parte Sullivan,* 107 F. Sup. 514, 517. "Bitter experience has sharpened our realization that a major test of true democracy is the fair administration of justice. . . . In the development of our liberty insistence upon procedural regularity has been a large factor . . . . It is not for nothing that most of the provisions of our Bill of Rights are concerned with matters of procedure. . . . Time out of mind this Court has reversed convictions for the most heinous offenses, even though no doubt about the guilt of the defendants was entertained. It reversed because the mode by which guilt was established disregarded those standards of procedure which are so precious and so important for our society." *Frankfurter, J.,* dissenting in *Sacher* v. *United States,* 343 U.S. 1, 23, 25, 28 (quoted in *Ex parte Sullivan,* supra, 518); see *State* v. *Doucette,* 147 Conn. 95, 108.

In denying the defendant the right to assistance of his counsel upon the facts as disclosed by the record in this case, we hold harmful error was committed; and accordingly, the conviction cannot stand.

There is error, the judgment is set aside and the case is remanded with direction to render judg-

ment that the defendant is not guilty and ordering that he be discharged.

In this opinion PRUYN, J., concurred.

KOSICKI, J. (dissenting). The majority opinion finds no support in any decision of our Supreme Court of Errors or the Supreme Court of the United States. The proposition posed has been twice presented to and twice rejected by the highest tribunal that may pass on infringement of constitutional rights violative of due process under the fourteenth amendment. To quote from *Crooker* v. *California,* 357 U.S. 433, 440: "Petitioner, however, contends that a different rule should determine whether there has been a violation of right to counsel. He would have every state denial of a request to contact counsel be an infringement of the constitutional right *without regard to the circumstances of the case.* In the absence of any confession, plea or waiver—or other event prejudicial to the accused—such a doctrine would create a complete anomaly, since nothing would remain that could be corrected on new trial. Refusal by state authorities of the request to contact counsel necessarily would then be an absolute bar to conviction. On the other hand, where an event has occurred while the accused was without his counsel which fairly promises to adversely affect his chances, the doctrine suggested by petitioner would have a lesser but still devastating effect on enforcement of criminal law, for it would effectively preclude police questioning—*fair as well as unfair*—until the accused was afforded opportunity to call his attorney. Due process, a concept 'less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights,' *Betts* v. *Brady,* 316 U.S. 455, 462 (1942), demands no such rule." (Italics intact.)

This holding is reiterated in *Cicenia* v. *Lagay*, 357 U.S. 504, 509, 510; note, 2 L. Ed. 2d 1644, 1646. My colleagues apparently entertain "some doubt on the longevity of *Crooker* and *Cicenia.*" We must follow the law as it is and not exercise a pretended clairvoyance on what the law may or may not be at some future time. The lone distinction made between those cases and the present one is that the police had already concluded their examination of the accused and he then had an absolute right to have counsel. That is not the law. It is only when such denial is under circumstances that are prejudicial to his defense that such claim may be entertained. That, of course, would present a question of fact for the trier, and cannot be derived from speculation. An appellate tribunal must confine its deliberations and decisions to the record. It may not indulge in an assumption or coloration of facts to suit its own exposition of principles of law. To sustain its conclusion, the majority opinion must rest on facts which were not found by the trial court: "He [the defendant] asked permission to use the telephone to call his lawyer. This request was denied. He later asked permission to call his wife. This request, too, was denied." These are facts simply assumed by the majority; they find no existence in the court's finding.

The finding of the court, to which no error has been assigned and which must be accepted, shows the following, in addition to those facts briefly stated in the majority opinion. The Chevrolet car, which was followed by Trooper Hubbard for a distance of two-tenths of a mile, was weaving from side to side in its lane. Twice it went from the right shoulder (traveling easterly) into the westbound lane. The trooper attempted to stop the car by sounding his horn and siren; he pulled alongside, but the driver ignored the cruiser. The driver of

the Chevrolet, in negotiating a right turn into Old State Road, pulled over into the oncoming lane of traffic. He stopped in the middle of the road after a siren blast. He then got out of his vehicle slowly and "weaved." The defendant was the driver. He smelled of alcohol, his pupils were dilated, his eyes watery and bloodshot, his face flushed, and his gait weaving. He asked the trooper for a "break" in order to walk home and started walking down Old State Road. He was then placed under arrest for operating under the influence of liquor and taken to the Colchester barracks, where Troopers Hubbard and MacDonald gave him sobriety tests. He failed the straight-line test, walking in a weaving fashion; his speech was slurred; his face ruddy and flushed. In attempting the finger-to-nose test, his finger first hit the bridge of his nose and slid down the nose. In pursuance of a state police policy, and because of his intoxication the defendant was placed in a cell, to be kept there for a period of four hours, during which he was denied the use of a telephone. We are not concerned here with a criticism of the policy, nor are we empowered to criticize it. We cannot with propriety express judgment on whether such a policy unduly restricts the freedom of an intoxicated person. Such restraints, based upon the experience of police officers charged with the duty of maintaining order and preserving peace, may well have a salutary effect on the individual and society alike. In cases like this, the police are required in the first instance to deal with people of varying degrees of insobriety. Keeping in custody one who obviously cannot be at large without danger to himself and others is not, in itself, an invasion of any constitutional right. No one can claim absolute freedom to conduct himself adversely to the laws designed to promote orderly and seemly behavior. The detention here

has not been claimed, nor was it found, to be illegal.

The next question is whether the defendant was deprived of any constitutional right by the asserted denial to him of the use of the police telephone. It is not maintained that the police were asked by him and refused to convey any reasonable message in his behalf. There was no duty on the troopers' part to provide the defendant with telephone service. In the light of the other subordinate facts, the simple finding that the defendant was able to use the telephone is meaningless. It is common knowledge that a person on the edge of unconsciousness may be able to handle a telephone. His ability to communicate is something else. Furthermore, there is not a crumb of suggestion that the claimed denial of his use of the telephone in any way impaired his defense. He was represented by competent counsel whom he perhaps engaged when released several hours after his arrest. Even if all the assumptions here made are accepted as true, "no prejudicial effects appear to have resulted from the defendant's lack of counsel." *State* v. *Traub,* 150 Conn. 169, 185. If he had desired a physician to examine him as to his condition, one would have been called. That is routine state police procedure of which we can take notice unless something contrary is indicated. If he had wanted to undergo a chemical test, it would have been provided at his request. He needed no counsel to avail himself of either of those things; he had only to ask. If, on the other hand, he had reached the stage when he was unable to make that decision for himself, then such an examination of his condition would obviously have been of no help to him in his defense.

My second ground of dissent is that the majority opinion derives no support from the record. The

finding is barren of any such subordinate facts as those on which the opinion is based. These assumptions of fact are literally taken from the defendant's motion to correct, which was denied. An examination of the evidence fails to disclose that they were admitted or undisputed as claimed; therefore, they cannot be added by us to a corrected finding. They are derived solely from the testimony of the accused, which the court could properly disbelieve in view of his other testimony that he was fit to drive, despite the undisputed facts summarized above. Although the assignment of errors challenges the ultimate finding of guilt, this claim apparently has been abandoned; if not, it is obviously without merit. The defendant's main, if not entire, contention is that he was deprived of his constitutional right to counsel of his own choice while he was under detention. The court has not found that deprivation to be a fact. We may not do so without arrogating to ourselves the function of the trial court to pass on the weight and credibility of evidence. We cannot find error in the court's refusal to credit the testimony of the defendant. We cannot, on our part, conjure facts or verbalize fictions in order to construct a sounding board for the rhetoric of high-principled opinions. Philosophical utterance which presupposes abstractions as facts serves no deeper purpose than Euclidian geometry, in which the concept of space is linear and the theorems of which are best exemplified in the adjustment of the carpenter's thumb to the law of gravity. The line that is plumb and the line that is level are plumb and level on a tiny surface of earth; they are not true when applied to the perimeter of the globe.

My third ground for disagreement is that the question of constitutional law urged on us is being presented here for the first time. No exception was taken to any ruling; there is not one word in the

transcript of evidence, the finding of facts, the motion to correct, or the assignment of errors that raises the constitutional question now evocated in the defendant's brief. It may seem tautological to say that no error can be committed by a trial court on a question of law on which it had no opportunity to commit error. The majority appear to acknowledge that this question, baldly stated in the opinion, is a new one not appearing in the record of the case, and that its decision rests not so much on a finding of error as on the expectation that a collateral issue now raised by the defendant should receive our original consideration. The general rule, to which this case affords no exception, is that an issue so grave as one involving a constitutional question must be raised as early in a trial as orderly procedure will allow under the circumstances of a given case, and must thereafter be kept alive by appropriate steps; otherwise it will be considered waived. *State* v. *Van Keegan,* 142 Conn. 229, 236; *Kenmike Theatre, Inc.* v. *Moving Picture Operators,* 139 Conn. 95, 100; *Grasso* v. *Frattolillo,* 111 Conn. 209, 214; *Rindge* v. *Holbrook,* 111 Conn. 72, 75; *DeFlumeri* v. *Sunderland,* 109 Conn. 583, 588. And the rule is firmly established that constitutional questions, even when properly raised, are to be decided only when necessary for a determination of the case.

The amended finding, filed at our instance after the record had been completed, states that the issue of deprivation of assistance of counsel, through the operation of the state police policy noted above, "was raised by defendant's counsel in his reargument at the conclusion of the case." There is no such report in the certified transcript filed in this case; therefore we can assume that the issue of constitutionality was not presented during the trial. If the question was raised by way of colloquy, or

after sentence, it certainly lacked the seriousness of purpose or precision of statement necessary in order that further attention could be directed to it —as by opening the judgment and a further hearing. This was not done; and the wholly unrecorded and vague claim, if made at all, furnished no basis for a ruling to which exception could have been taken and which then, on appeal, could have been assigned as error.

Finally, there is nothing in our substantive law which sustains the action being taken. The authorities relied on, by resort to periphrasis, do not appear to be in point. No case has been cited in support of the proposition stated. The decisions which touch upon the question, however obliquely, do so in connection with police interrogations as bearing on the voluntariness of confessions; and they concern only felony cases. The quotation from Swift has reference principally to the old English procedure, never adopted here, under which an accused could have counsel (for a limited purpose) but could not offer evidence. *Chandler* v. *Fretag,* 348 U.S. 3, 9, has its counterpart in this state in *State* v. *Maresca,* 85 Conn. 509, 510, in which the accused, charged with a felony, had no counsel on his arraignment and plea of guilty. *Spano* v. *New York,* 360 U.S. 315, 326, involved a capital crime and a confession. In *Ex parte Sullivan,* 107 F. Sup. 514, 517 (D. Utah), the question was not one of denial of counsel but "whether the officers, after denying defendants counsel, can continue to hound them to give evidence against themselves." The defendants there were charged with first-degree murder. The quotation from *Sacher* v. *United States,* 343 U.S. 1, 23, is obiter dictum in a dissenting opinion, and the decision itself in no way relates to what the majority considers to be the issue before us.

If the rule enunciated by the majority is to prevail, then it may be expected that any indigent defendant, being detained under a proper arrest, can well claim that he is being denied the equal protection of the laws, because, even if his case warranted the assignment of a public defender, such an appointment could not be made until after his presentation in court; and thus the accused would be deprived of his right to counsel immediately upon his arrest. Carried to its logical extreme, a murderer, detained under the circumstances present in this case, would be liberated despite his proven guilt.

I view with sadness and regret a pronouncement of this novel rule of law which, upon the thinnest assumptions, having no relation to the general issue on which the accused was tried, frees him of guilt of which there can be no reasonable doubt. This has been done gratuitously, without support of anything in the record or in our procedural or substantive law. It has been accomplished by accepting as true facts which were not found to be true. We are not privileged to engage in a feat of necromancy, by materializing dragons in order to slay them. The judgment should stand.