## CROOKER *v.* CALIFORNIA.

No. 178.   Argued April 2, 1958.—Decided June 30, 1958.

*Robert W. Armstrong* argued the cause and filed a brief for petitioner.

*William E. James,* Deputy Attorney General of California, argued the cause for respondent.   With him on

the brief were *Edmund G. Brown,* Attorney General, *William B. McKesson* and *Fred N. Whichello.*

*A. L. Wirin* and *Fred Okrand* filed a brief for the American Civil Liberties Union of Southern California.

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner, under sentence of death for the murder of his paramour, claims that his conviction in a California court violates Fourteenth Amendment due process of law because (1) the confession admitted into evidence over his objection had been coerced from him by state authorities, and (2) even if his confession was voluntary it occurred while he was without counsel because of the previous denial of his request therefor. The Supreme Court of California affirmed the conviction. 47 Cal. 2d 348, 303 P. 2d 753. Certiorari was granted because of the serious due process implications that attend state denial of a request to employ an attorney. 354 U. S. 908 (1957).[1] We conclude, however, that no violation of constitutional right has occurred.

The record here clearly reveals that prior to petitioner's confession he asked for and was denied opportunity to call his lawyer. We first consider that denial in connection with petitioner's contention that his subsequent confession was involuntary in nature.

It is well established that the Fourteenth Amendment prohibits use of coerced confessions in state prosecutions. *E. g., Brown* v. *Mississippi,* 297 U. S. 278 (1936); *Watts* v.

---

[1] The grant of certiorari was limited to two questions:

"1. Was the defendant denied due process of law by the refusal of the investigation officers to allow him to consult with an attorney upon demand being made to do so while he was in custody?

"2. Was the defendant denied due process of law by the admission into evidence of a confession which was taken from him while in custody and after he had been in such custody for fourteen hours and had not been allowed to consult with his attorney?"

*Indiana,* 338 U. S. 49 (1949); *Fikes* v. *Alabama,* 352 U. S. 191 (1957). As in *Thomas* v. *Arizona,* 356 U. S. 390, and *Payne* v. *Arkansas,* 356 U. S. 560, both decided this Term, we consider the undisputed facts in the record to ascertain whether the confession resulted from police coercion or the exercise of petitioner's own free will.

The victim's son discovered her body the morning of July 5, 1955, stabbed and strangled to death in the bedroom of her Los Angeles home. She was last known to be alive about 1 a. m. the same day, when she talked with a friend by telephone.

Petitioner was arrested in his apartment at 1:30 that afternoon and subsequently was charged with the murder. He was then 31 years of age, a college graduate who had attended the first year of law school. While going to law school he had been a houseboy in the home of the victim. That position led to an illicit relationship with her, which she had attempted several times to terminate in the month preceding her death. The week of her death, after telling petitioner they had been found out, she had requested, and he had agreed, that he would never see her again.

Despite this understanding, he returned to her house late in the afternoon of July 4. Finding no one at home, he hid nearby for the ostensible purpose of discovering who was "threatening" her. From his hiding place he watched the victim return home with an escort around midnight. Shortly thereafter he saw the escort leave and watched the victim talk on the the telephone. He claims that he then left the vicinity to return to his apartment, never having entered the house that evening.

At the time of his arrest, petitioner was questioned about scratches that were evident on his neck and hands. He attributed the former to shaving and the latter to a traffic mishap on his way to the beach on July 4. However he refused to reveal where the accident occurred.

After his apartment was searched, petitioner was taken to the Los Angeles Police Station, where he was photographed and asked to take a lie detector test. He refused to submit to the test, and indicated that he wanted to call an attorney. At no time, however, does it appear that petitioner was offered the use of a telephone. Aside from sporadic questioning at his apartment, petitioner was interrogated for the first time from 8:30–9:30 p. m., the questioning being conducted by four officers and centering around his refusal of the lie detector test. During this time he asked for an opportunity to get a lawyer, naming a specific attorney whom he thought might represent him, but was told that "after [the] investigation was concluded he could call an attorney."

At 9:30 p. m. petitioner was transferred to the West Los Angeles Police Station, where five officers questioned him from 11 p. m. until shortly after midnight. He then was formally "booked," and given a physical examination by a police physician. The third and last questioning period was conducted by the same five men from approximately 1–2 a. m. July 6. For the next hour petitioner wrote and signed a detailed confession of the murder. Afterward, he was taken to the victim's home to re-enact the crime. At 5 a. m. he was put in jail and permitted to sleep.

That afternoon, a full day after his arrest, he was taken to the office of the Los Angeles County District Attorney to orally repeat the written confession. Petitioner balked at doing so and again asked that his attorney be called. Thereupon the District Attorney placed the call for him and listened to the conversation while petitioner talked on an extension phone with the attorney. Neither petitioner nor his attorney was aware that a tape recording was being made of everything that transpired in the office. The District Attorney interrupted at one point to deny that petitioner was forced to answer police questions,

and later to advise that the most convenient time for the attorney to see petitioner would be at 7 p. m. back at the West Los Angeles Police Station. After the phone call, petitioner was returned to jail to meet his attorney that evening. From that time forward, through both arraignment and trial, he was represented by his own counsel.

In the 14 hours between his arrest and confession, petitioner was given coffee and allowed to smoke whenever he liked. He also was given milk and a sandwich a few hours after his arrest. Before being transferred to the West Los Angeles Police Station he was advised by a police lieutenant, "You don't have to say anything that you don't want to," and he in fact refused to answer many questions both before and after the transfer. At such times he simply stated he "would rather not answer, or rather not make a statement about that."

The bare fact of police "detention and police examination in private of one in official state custody" does not render involuntary a confession by the one so detained. *Brown* v. *Allen,* 344 U. S. 443, 476 (1953). Neither does an admonition by the police to tell the truth, *Sparf* v. *United States,* 156 U. S. 51, 55–56 (1895), nor the failure of state authorities to comply with local statutes requiring that an accused promptly be brought before a magistrate.[2] *Fikes* v. *Alabama,* 352 U. S. 191 (1957).

Petitioner's claim of coercion, then, depends almost entirely on denial of his request to contact counsel.[3] This

---

[2] Section 849 of the California Penal Code provides that a person arrested without a warrant must be brought before the nearest or most accessible magistrate in the county of arrest "without unnecessary delay." Cal. Penal Code, 1956, § 849.

[3] Even if within the scope of the limited grant of certiorari, claims of physical violence—"third degree" methods—were denied by witnesses for the State, and hence are not part of the undisputed portions of the record which we consider here. The ambiguous reply by one police officer, "I don't think we hurt you," in response to petitioner's

Court has not previously had occasion to determine the character of a confession obtained after such a denial. But we have held that confessions made by indigent defendants prior to state appointment of counsel are not thereby rendered involuntary, even in prosecutions where conviction without counsel would violate due process under the Fourteenth Amendment. *Brown* v. *Allen,* 344 U. S. 443, 474–476 (1953); *Stroble* v. *California,* 343 U. S. 181, 196–198 (1952); *Gallegos* v. *Nebraska,* 342 U. S. 55, 64–68 (1951). To be sure, coercion seems more likely to result from state denial of a specific request for opportunity to engage counsel than it does from state failure to appoint counsel immediately upon arrest. That greater possibility, however, is not decisive. It is negated here by petitioner's age, intelligence, and education. While in law school he had studied criminal law; indeed, when asked to take the lie detector test, he informed the operator that the results of such a test would not be admissible at trial absent a stipulation by the parties. Supplementing that background is the police statement to petitioner well before his confession that he did not have to answer questions. Moreover, the manner of his refusals to answer indicates full awareness of the right to be silent. On this record we are unable to say that petitioner's confession was anything other than voluntary.

We turn now to the contention that even if the confession be voluntary, its use violates due process because it was obtained after denial of petitioner's request to contact his attorney. Petitioner reaches this position by reasoning first that he has been denied a due process right

---

assertion in the District Attorney's office that the officer struck him, cannot alter the contradicted state of the evidence when the same officer categorically denied the claim on cross-examination at the trial.

to representation and advice from his attorney,[4] and secondly that the use of any confession obtained from him during the time of such a denial would itself be barred by the Due Process Clause, even though freely made. We think petitioner fails to sustain the first point, and therefore we do not reach the second.

The right of an accused to counsel for his defense, though not firmly fixed in our common-law heritage, is of significant importance to the preservation of liberty in this country. See 1 Cooley's Constitutional Limitations (8th ed. 1927) 696–700; 2 Story on the Constitution (4th ed. 1873) § 1794. That right, secured in state prosecutions by the Fourteenth Amendment guaranty of due process, includes not only the right to have an attorney appointed by the State in certain cases, but also the right of an accused to "a fair opportunity to secure counsel of his own choice." *Powell* v. *Alabama,* 287 U. S. 45, 53 (1932); *Chandler* v. *Fretag,* 348 U. S. 3 (1954).

Under these principles, state refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, *Chandler* v. *Fretag, supra,* but also if he is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of "that fundamental fairness essential to the very concept of justice." *Lisenba* v. *California,* 314 U. S. 219, 236 (1941). Cf. *Moore* v. *Michigan,* 355 U. S.

---

[4] At times petitioner appears to urge "a rule" barring use of a voluntary confession obtained after state denial of a request to contact counsel regardless of whether any violation of a due process right to counsel occurred. That contention is simply an appeal to the supervisory power of this Court over the administration of justice in the federal courts. See *McNabb* v. *United States,* 318 U. S. 332 (1943), which, significantly enough, petitioner cites. The short answer to such a contention here is that this conviction was had in a state, not a federal, court.

155, 160 (1957). The latter determination necessarily depends upon all the circumstances of the case.

In *House* v. *Mayo,* 324 U. S. 42 (1945), an uneducated man in his twenties, a stranger to the area, was brought before a court to be sentenced on two convictions previously returned against him. He was there presented for the first time with a burglary information filed by the State, asked for and was denied opportunity to engage counsel, and finally pleaded guilty to the information, thereby obviating any necessity for trial of the charge on the merits. We held that a due process right to counsel was denied.

In contrast, the sum total of the circumstances here during the time petitioner was without counsel is a voluntary confession by a college-educated man with law school training who knew of his right to keep silent. Such facts, while perhaps a violation of California law,[5] do not approach the prejudicial impact in *House* v. *Mayo, supra,* and do not show petitioner to have been so "taken advantage of," *Townsend* v. *Burke,* 334 U. S. 736, 739 (1948), as to violate due process of law.

Petitioner, however, contends that a different rule should determine whether there has been a violation of right to counsel. He would have every state denial of a request to contact counsel be an infringement of the constitutional right *without regard to the circumstances of the case.* In the absence of any confession, plea or waiver—or other event prejudicial to the accused—such a doctrine would create a complete anomaly, since nothing would remain that could be corrected on new trial.

---

[5] Section 825 of the California Penal Code provides that after an arrest, an attorney "may at the request of the prisoner or any relative of such prisoner, visit the person so arrested." Any officer in charge of the prisoner who wilfully refuses to let the attorney see the prisoner is made guilty of a misdemeanor. Cal. Penal Code, 1956, § 825.

Refusal by state authorities of the request to contact counsel necessarily would then be an absolute bar to conviction. On the other hand, where an event has occurred while the accused was without his counsel which fairly promises to adversely affect his chances, the doctrine suggested by petitioner would have a lesser but still devastating effect on enforcement of criminal law, for it would effectively preclude police questioning—*fair as well as unfair*—until the accused was afforded opportunity to call his attorney. Due process, a concept "less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights," *Betts* v. *Brady,* 316 U. S. 455, 462 (1942), demands no such rule.[6]

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, dissenting.

When petitioner was first arrested, and before any real interrogation took place, he asked that his attorney be present. "I had no objection to talking with them about whatever they had to talk about, but . . . I wanted counsel with me . . . . I wanted an attorney with me before I would talk with them."

---

[6] It is suggested that this decision extends the rule of *Betts* v. *Brady,* 316 U. S. 455 (1942), to a capital case, thereby overruling, I should suppose, *Powell* v. *Alabama,* 287 U. S. 45, and related cases. But those decisions involve another problem, trial and conviction of the accused without counsel after state refusal to appoint an attorney for him. What due process requires in one situation may not be required in another, and this, of course, because the least change of circumstances may provide or eliminate fundamental fairness. The ruling here that due process does not always require immediate honoring of a request to obtain one's own counsel in the hours after arrest, hardly means that the same concept of fundamental fairness does not require state appointment of counsel before an accused is put to trial, convicted and sentenced to death.

That was petitioner's testimony; and it is verified by the testimony of Sergeant Gotch of the police.

"A. I stated to him that after our investigation was concluded he could call an attorney, and if he didn't have funds to hire an attorney, when he went to Court a public defender would be assigned to handle his case.

"He then stated that he had a friend who had been an instructor at Pepperdine College that would probably handle the case for him. I asked him who the name was, and he said it was a man by the name of Simpson, who lived in Long Beach.

"Q. He asked you if he could call an attorney at that time, and you told him that he could call after your investigation was completed, is that right?

"A. I told him, after I was through with the investigation, he could make a call."

This demand for an attorney was made over and again prior to the time a confession was extracted from the accused. Its denial was in my view a denial of that due process of law guaranteed the citizen by the Fourteenth Amendment.

The Court finds no prejudice from the denial of the right to consult counsel; and it bases that finding on the age, intelligence, and education of petitioner. But it was said in *Glasser* v. *United States,* 315 U. S. 60, 76, "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." That was a federal prosecution. But what is true of the need for counsel in a federal case is equally true in a state case.

*Betts* v. *Brady,* 316 U. S. 455, held that in a state criminal trial the request of the accused for counsel can be denied and a judgment of conviction sustained as not in

violation of due process, where the offense is not a capital one, cf. *Williams* v. *Kaiser,* 323 U. S. 471, and the Court on review determines there was no fundamental unfairness resulting from the denial of counsel. The rule of *Betts* v. *Brady,* which never applied to a capital case, see *Powell* v. *Alabama,* 287 U. S. 45, is now made to do so. Assuming that *Betts* v. *Brady* was properly decided, there is no basis in reason for extending it to the denial of a request for counsel when the accused is arrested on a capital charge.

The Court properly concedes that the right to counsel extends to pretrial proceedings as well as to the trial itself. The need is as great then as at any time. The right to have counsel at the pretrial stage is often necessary to give meaning and protection to the right to be heard at the trial itself. See *Chandler* v. *Fretag,* 348 U. S. 3, 10. It may also be necessary as a restraint on the coercive power of the police. The pattern of the third degree runs through our cases: a lone suspect unrepresented by counsel against whom the full coercive force of a secret inquisition is brought to bear. See *Lisenba* v. *California,* 314 U. S. 219; *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Haley* v. *Ohio,* 332 U. S. 596; *Watts* v. *Indiana,* 338 U. S. 49; *Leyra* v. *Denno,* 347 U. S. 556. The third degree flourishes only in secrecy. One who feels the need of a lawyer and asks for one is asking for some protection which the law can give him against a coerced confession. No matter what care is taken innocent people are convicted of crimes they did not commit, see Borchard, Convicting the Innocent (1932); Frank and Frank, Not Guilty (1957). We should not lower the barriers and deny the accused any procedural safeguard against coercive police practices.[1] The trial of the issue of coercion is

---

[1] The use of techniques that make men admit crimes they did not commit and embrace ideas they oppose is told in Communist Interrogation, Indoctrination and Exploitation of American Military and

seldom helpful. Law officers usually testify one way, the accused another. The citizen who has been the victim of these secret inquisitions has little chance to prove coercion. The mischief and abuse of the third degree will continue as long as an accused can be denied the right to counsel at this the most critical period of his ordeal.[2] For what takes

---

Civilian Prisoners, S. Rep. No. 2832, 84th Cong., 2d Sess.

Prof. Sam Bass Warner wrote in How Can The Third Degree Be Eliminated? 1 Bill of Rights Rev. 24, 25 (1940): "Everywhere the formula for successful detective work is that laid down by former Captain Fiaschetti of the New York City police: 'You get a bit of information, and then you grab the suspect and break him down. That is how detective work is done—a general formula.'"

See Report of Committee on Lawless Enforcement of Law, Am. Bar Assn., 1 Am. J. Police Sci. 575; The Third Degree, 4 Report to the National Commission on Law Observance and Enforcement (1931) 13; The Report of the President's Committee on Civil Rights (1947) 25 *et seq.*

[2] Dean Roscoe Pound wrote in 1934 as follows about this problem: "In the United States the feeling of police and prosecutors that they ought to be able to interrogate suspected persons long ago led to a systematic development of extra-legal or downright illegal examinations by officials, with every external appearance of legality. These examinations have become so much a matter of course that we may read in every morning paper how police or prosecutor examined (the word usually chosen is 'grilled') so and so for anywhere from ten to forty-eight or more consecutive hours, going at him in relays to wear him out and break him down. They are now taken to be the established practice. Prosecutors often conduct them with a pretence of authority when those subjected to them are ignorant, unadvised as to their rights, insignificant, or without means of employing counsel. Indeed, so bold have those who resort to those practices become, that we now read in the newspapers how this man or that was held 'incommunicado' in a police station or jail while the grilling process was going on.

.        .        .        .        .

"No amount of thundering against the third degree and its derivatives and analogues will achieve anything. The temper of the public will not permit of strengthening the constitutional safeguards

place in the secret confines of the police station may be more critical than what takes place at the trial.

> "If at any time, from the time of his arrest to final determination of his guilt or innocence, an accused really needs the help of an attorney, it is in the pre-trial period. . . . Indeed, the pre-trial period is so full of hazards for the accused that, if unaided by competent legal advice, he may lose any legitimate

---

of the accused. For some time to come the tendency is likely to be in the opposite direction. Indeed, a feeling that the public are with them is largely behind the boldness with which high-handed, secret, extra-legal interrogations of persons held *incommunicado* are constantly carried on.

"My proposition is that the remedy for the third degree and its derivatives is to satisfy the reasonable demands of the police and the prosecutors for an interrogation of suspected persons and thus do away with the excuse for extra-legal questionings.

"I submit that there should be express provision for a legal examination of suspected or accused persons before a magistrate; that those to be examined should be allowed to have counsel present to safeguard their rights; that provision should be made for taking down the evidence so as to guarantee accuracy. As things are, it is not the least of the abuses of the system of extra-legal interrogation that there is a constant conflict of evidence as to what the accused said and as to the circumstances under which he said or was coerced into saying it." 24 J. Crim. L. & C. 1014, 1016, 1017.

As recently stated by T. B. Smith, a distinguished Scottish lawyer:

"The opportunities for exerting pressure on a suspect to confess are greatest when there is no judicial supervision, no legal representation and no public scrutiny. If an accused at his trial seeks to retract a confession allegedly extorted by third-degree methods, his word will stand alone against several police witnesses who may be expected to deny improper pressure. It is well known that in the totalitarian states extra-judicial pressure by brain-washing can eventually convince even the accused that he has committed the most improbable offenses, but when a confession has been extorted by less thorough third-degree methods it is likely to be retracted at the trial. The accused may, nevertheless, by then have damaged his position irreparably." 32 Tulane L. Rev. 349, 354.

defense he may have long before he is arraigned and put on trial." Note, Criminal Procedure—Right to Counsel Prior to Trial, 44 Ky. L. J. 103–104.

Or as stated by a Committee headed by Prof. Zechariah Chafee, "A person accused of crime needs a lawyer right after his arrest probably more than at any other time." [3]

The Court speaks of the education of this petitioner and his ability to take care of himself. In an opinion written by Mr. Justice Sutherland the Court said, "Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He requires the guiding hand of counsel at every step in the proceedings against him." *Powell* v. *Alabama*, 287 U. S. 45, 69. Mr. Justice Sutherland spoke of the trial itself. But what is true of the trial is true of the preparation for trial and of the period commencing with the arrest of the accused. No matter how well educated and how well trained in the law an accused may be, he is sorely in need of legal advice once he is arrested for an offense that may exact his life.

---

[3] See Chafee, Documents on Fundamental Human Rights, Pamphlets 1–3 (1951–1952), p. 541.

The Scots view was recently stated by the Lord Justice General in *Chalmers* v. *H. M. Advocate*, 1954 Sess. Cas. 66, 78:

"The theory of our law is that at the stage of initial investigation the police may question anyone with a view to acquiring information which may lead to the detection of the criminal; but that, when the stage has been reached at which suspicion, or more than suspicion, has in their view centred upon some person as the likely perpetrator of the crime, further interrogation of that person becomes very dangerous, and, if carried too far, *e. g.*, to the point of extracting a confession by what amounts to cross-examination, the evidence of that confession will almost certainly be excluded. Once the accused has been apprehended and charged he has the statutory right to a private interview with a solicitor and to be brought before a magistrate with all convenient speed so that he may, if so advised, emit a declaration in presence of his solicitor under conditions which safeguard him against prejudice."

The innocent as well as the guilty may be caught in a web of circumstantial evidence that is difficult to break. A man may be guilty of indiscretions but not of the crime. He may be implicated by ambiguous circumstances difficult to explain away. He desperately needs a lawyer to help extricate him if he's innocent. He has the right to receive the benefit of the advice of his own counsel at the trial, as we held in *Chandler* v. *Fretag*, 348 U. S. 3, 9. That same right should extend to the pretrial stage.

The need of a lawyer in the pretrial investigation, if the constitutional rights of the accused are to be preserved, was stated by MR. JUSTICE BLACK, dissenting, in *In re Groban*, 352 U. S. 330, 340–343:

"The witness has no effective way to challenge his interrogator's testimony as to what was said and done at the secret inquisition. The officer's version frequently may reflect an inaccurate understanding of an accused's statements or, on occasion, may be deliberately distorted or falsified. While the accused may protest against these misrepresentations, his protestations will normally be in vain. This is particularly true when the officer is accompanied by several of his assistants and they all vouch for his story. But when the public, or even the suspect's counsel, is present the hazards to the suspect from the officer's misunderstanding or twisting of his statements or conduct are greatly reduced.

"The presence of legal counsel or any person who is not an executive officer bent on enforcing the law provides still another protection to the witness. Behind closed doors he can be coerced, tricked or confused by officers into making statements which may be untrue or may hide the truth by creating misleading impressions. While the witness is in the custody of the interrogators, as a practical matter, he

is subject to their uncontrolled will. . . . Nothing would be better calculated to prevent misuse of official power in dealing with a witness or suspect than the scrutiny of his lawyer or friends or even of disinterested bystanders."

The demands of our civilization expressed in the Due Process Clause require that the accused who wants a counsel should have one at any time after the moment of arrest.[4]

---

[4] Quite a few of the States provide that procedural safeguard against coercive police practices. The California Penal Code, § 825, provides:

"The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; and after such arrest, any attorney at law entitled to practice in the courts of record of California, may at the request of the prisoner or any relative of such prisoner, visit the person so arrested. Any officer having charge of the prisoner so arrested who wilfully refuses or neglects to allow such attorney to visit a prisoner is guilty of a misdemeanor. Any officer having a prisoner in charge, who refuses to allow any attorney to visit the prisoner when proper application is made therefor shall forfeit and pay to the party aggrieved the sum of five hundred dollars, to be recovered by action in any court of competent jurisdiction."

Another type of statute is that contained in Kan. Gen. Stat., 1949, § 62–1304a, which provides:

"That any person held in restraint of his liberty pending trial or held for investigation in any jail or other place of confinement in this state, shall be permitted upon request to immediately confer privately with an attorney of his choice in the same room with such attorney and without any barriers between such person and his attorney, and without any listening in or recording devices."

For statutes similar to the Kansas Act see Colo. Rev. Stat. Ann., 1953 (1957 Cum. Supp.), c. 39–1–1; Ill. Rev. Stat., 1955, c. 38, § 449.1; Vernon's Ann. Mo. Stat., 1953, § 544.170; Mont. Rev. Codes, 1947, § 93–2117; N. H. Rev. Stat. Ann., 1955, c. 594:16; N. C. Gen. Stat., 1953 (1957 Cum. Supp.), § 15–47; Page's Ohio Rev. Code Ann., 1954, § 2935.16. See also § 37 of the A. L. I. Model Code of Criminal Procedure.