Mr. Justice White,
with whom Mr. Justice Clark and Mr. Justice Harlan join,
dissenting.
The current incidence of serious violations of the law represents not only an appalling waste of the potentially happy and useful lives of those who engage in such conduct but also an overhanging, dangerous threat to those unidentified and innocent people who will be the victims of crime today and tomorrow. This is a festering problem for which no adequate cures have yet been devised. At the very least there is much room for discontent with remedial measures so far undertaken. And admittedly there remains much to be settled concerning the disposition to be made of those who violate the law.
But dissatisfaction with preventive programs aimed at eliminating crime and profound dispute about whether we should punish, deter, rehabilitate or cure cannot excuse concealing one of our most menacing problems until the millennium has arrived. In my view, a civilized society must maintain its capacity to discover transgressions of the law and to identify those who flout it. This much is necessary even to know the scope of the problem, much less to formulate intelligent countermeasures. It will just not do to sweep these disagreeable matters under the rug or to pretend they are not there at all.
*340 It is therefore a rather portentous occasion when a constitutional rule is established barring the use of evidence which is relevant, reliable and highly probative of the issue which the trial court has before it — whether the accused committed the act with which he is charged. Without the evidence, the quest for truth may be seriously impeded and in many cases the trial court, although aware of proof showing defendant’s guilt, must nevertheless release him because the crucial evidence is deemed inadmissible. This result is entirely justified in some circumstances because exclusion serves other policies of overriding importance, as where evidence seized in an illegal search is excluded, not because of the quality of the proof, but to secure meaningful enforcement of the Fourth Amendment. Weeks v. United States, 232 U. S. 383; Mapp v. Ohio, 367 U. S. 643. But this only emphasizes that the soundest of reasons is necessary to warrant the exclusion of evidence otherwise admissible and the creation of another area of privileged testimony. With all due deference, I am not at all convinced that the additional barriers to the pursuit of truth which the Court today erects rest on anything like the solid foundations which decisions of this gravity should require.
The importance of the matter should not be underestimated, for today’s rule promises to have wide application well beyond the facts of this case. The reason given for the result here — the admissions were obtained in the absence of counsel — would seem equally pertinent to statements obtained at any time after the right to counsel attaches, whether there has been an indictment or not; to admissions made prior to arraignment, at least where the defendant has counsel or asks for it; to the fruits of admissions improperly obtained under the new rule; to criminal proceedings in state courts; and to defendants long since convicted upon evi *341 dence including such admissions. The new rule will immediately do service in a great many cases.
Whatever the content or scope of the rule may prove to be, I am unable to see how this case presents an unconstitutional interference with Massiah’s right to counsel. Massiah was not prevented from consulting with counsel as often as he wished. No meetings with counsel were disturbed or spied upon. Preparation for trial was in no way obstructed. It is only a sterile syllogism — an unsound one, besides — to say that because Massiah had a right to counsel’s aid before and during the trial, his out-of-court conversations and admissions must be excluded if obtained without counsel’s consent or presence. The right to counsel has never meant as much before, Cicenia v. Lagay, 357 U. S. 504; Crooker v. California, 357 U. S. 433, and its extension in this case requires some further explanation, so far unarticulated by the Court.
Since the new rule would exclude all admissions made to the police, no matter how voluntary and reliable, the requirement of counsel’s presence or approval would seem to rest upon the probability that counsel would foreclose any admissions at all. This is nothing more than a thinly disguised constitutional policy of minimizing or entirely prohibiting the use in evidence of voluntary out-of-court admissions and confessions made by the accused. Carried as far as blind logic may compel some to go, the notion that statements from the mouth of the defendant should not be used in evidence would have a severe and unfortunate impact upon the great bulk of criminal cases.
Viewed in this light, the Court’s newly fashioned exclusionary principle goes far beyond the constitutional privilege against self-incrimination, which neither requires nor suggests the barring of voluntary pretrial admissions. The Fifth Amendment states that no person “shall be compelled in any criminal case to be a witness against *342 himself . . . .” The defendant may thus not be compelled to testify at his trial, but he may if he wishes. Likewise he may not be compelled or coerced into saying anything before trial; but until today he could if he wished to, and if he did, it could be used against him. Whether as a matter of self-incrimination or of due process, the proscription is against compulsion — coerced incrimination. Under the prior law, announced in countless cases in this Court, the defendant’s pretrial statements were admissible evidence if voluntarily made; inadmissible if not the product of his free will. Hardly any constitutional area has been more carefully patrolled by this Court, and until now the Court has expressly rejected the argument that admissions are to be deemed involuntary if made outside the presence of counsel. Cicenia v. Lagay, supra; Crooker v. California, supra.*
The Court presents no facts, no objective evidence, no reasons to warrant scrapping the voluntary-involuntary test for admissibility in this area. Without such evidence I would retain it in its present form.
This case cannot be analogized to the American Bar Association’s rule forbidding an attorney to talk to the opposing party litigant outside the presence of his counsel. Aside from the fact that the Association’s canons are not of constitutional dimensions, the specific canon argued is inapposite because it deals with the con *343 duct of lawyers and not with the conduct of investigators. Lawyers are forbidden to interview the opposing party because of the supposed imbalance of legal skill and acumen between the lawyer and the party litigant; the reason for the rule does not apply to nónlawyers and certainly not to Colson, Massiah’s codefendant.
Applying the new exclusionary rule is peculiarly inappropriate in this case. At the time of the conversation in question, petitioner was not in custody but free on bail. He was not questioned in what anyone could call an atmosphere of official coercion. What he said was said to his partner in crime who had also been indicted. There was no suggestion or any possibility of coercion. What petitioner did not know was that Colson had decided to report the conversation to the police. Had there been no prior arrangements between Colson and the police, had Colson simply gone to the police after the conversation had occurred, his testimony relating Massiah’s statements would be readily admissible at the trial, as would a recording which he might have made of the conversation. In such event, it would simply be said that Massiah risked talking to a friend who decided to disclose what he knew of Massiah’s criminal activities. But if, as occurred here, Colson had been cooperating with the police prior to his meeting with Massiah, both his evidence and the recorded conversation are somehow transformed into inadmissible evidence despite the fact that the hazard to Massiah remains precisely the same— the defection of a confederate in crime.
Reporting criminal behavior is expected or even demanded of the ordinary citizen. Friends may be subpoenaed to testify about friends, relatives about relatives and partners about partners. I therefore question the soundness of insulating Massiah from the apostasy of his partner in crime and of furnishing constitutional sanctions for the strict secrecy and discipline of criminal or *344 ganizations. Neither the ordinary citizen nor the confessed criminal should be discouraged from reporting what he knows to the authorities and from lending his aid to secure evidence of crime. Certainly after this case the Colsons will be few and far between; and the Massiahs can breathe much more easily, secure in the knowledge that the Constitution furnishes an important measure of protection against faithless compatriots and guarantees sporting treatment for sporting peddlers of narcotics.
Meanwhile, of course, the public will again be the loser and law enforcement will be presented with another serious dilemma. The general issue lurking in the background of the Court’s opinion is the legitimacy of penetrating or obtaining confederates in criminal organizations. For the law enforcement agency, the answer for the time being can only be in the form of a prediction about the future application of today’s new constitutional doctrine. More narrowly, and posed by the precise situation involved here, the question is this: when the police have arrested and released on bail one member of a criminal ring and another member, a confederate, is cooperating with the police, can the confederate be allowed to continue his association with the ring or must he somehow be withdrawn to avoid challenge to trial evidence on the ground that it was acquired after rather than before the arrest, after rather than before the indictment?
Defendants who are out on bail have been known to continue their illicit operations. See Rogers v. United States, 325 F. 2d 485 (C. A. 10th Cir.). That an attorney is advising them should not constitutionally immunize their statements made in furtherance of these operations and relevant to the question of their guilt at the pending prosecution. In this very case there is evidence that after indictment defendant Aiken tried to *345 persuade Agent Murphy to go into the narcotics business with him. Under today’s decision, Murphy may neither testify as to the content of this conversation nor seize for introduction in evidence any narcotics whose location Aiken may have made known.
Undoubtedly, the evidence excluded in this case would not have been available but'for the conduct of Colson in cooperation with Agent Murphy, but is it this kind of conduct which should be forbidden to those charged with law enforcement? It is one thing to establish safeguards against procedures fraught with the potentiality of coercion and to outlaw “easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection.” McNabb v. United States, 318 U. S. 332, 344. But here there was no substitution of brutality for brains, no inherent danger of police coercion justifying the prophylactic effect of another exclusionary rule. Massiah was not being interrogated in a police station, was not surrounded by numerous officers or questioned in relays, and was not forbidden access to others. Law enforcement may have the elements of a contest about it, but it is not a game. McGuire v. United States, 273 U. S. 95, 99. Massiah and those like him receive ample protection from the long line of precedents in this Court holding that confessions may not be introduced unless they are voluntary. In making these determinations the courts must consider the absence of counsel as one of several factors by which voluntariness is to be judged. See House v. Mayo, 324 U. S. 42, 45-46; Payne v. Arkansas, 356 U. S. 560, 567; Cicenia v. Lagay, supra, at 509. This is a wiser rule than the automatic rule announced by the Court, which requires courts and juries to disregard voluntary admissions which they might well find to be the best possible evidence in discharging their responsibility for ascertaining truth.

Today’s rule picks up where the Fifth Amendment ends and bars wholly voluntary admissions. I would assume, although one cannot be sure, that the new rule would not have a similar supplemental role in connection with the Fourth Amendment. While the Fifth Amendment bars only compelled incrimination, the Fourth Amendment bars only unreasonable searches. It could be argued, fruitlessly I would hope, that if the police must stay away from the defendant they must also stay away from his house once the right to counsel has attached and that a court must exclude the products of a reasonable search made pursuant to a properly issued warrant but without the consent or presence of the accused’s counsel.