UNITED STATES of America ex rel. Edward DAVIS, Petitioner,

v.

The Honorable James H. DAVIS, Governor of the State of Louisiana, and Victor G. Walker, Warden of the Louisiana State Penitentiary, Respondents.

No. 694.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

May 21, 1964.

650

Benjamin E. Smith, Bruce C. Waltzer, Smith, Waltzer, Jones & Peebles, Adolph J. Levy, New Orleans, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen., Teddy W. Airhart, Jr., Asst. Atty. Gen., State of Louisiana, Baton Rouge, La., Bertrand DeBlanc, Dist. Atty., Fifteenth Judicial District, Lafayette, La., for respondents.

WEST, District Judge.

Petitioner, Edward Davis, has applied to this Court for the issuance of a writ of habeas corpus. He is presently incarcerated at the Louisiana State Penitentiary, awaiting execution pursuant to a prior conviction of murder. His conviction was duly appealed through the Supreme Court of the State of Louisiana where both the conviction and sentence were affirmed. A death warrant was then issued by the Governor of the State of Louisiana, ordering petitioner's execution on Friday, September 6, 1963. No application was ever made to the United States Supreme Court for a writ of certiorari. Petitioner did, however, apply to the Twentieth Judicial District Court for the Parish of West Feliciana, State of Louisiana, for the issuance of a writ of habeas corpus. His application was denied on August 30, 1963, and he then applied to the Supreme Court for the State of Louisiana for the issuance of a writ of habeas corpus, which application was also denied on September 4, 1963.

On September 5, 1963, petitioner filed with this Court an application for the issuance of a writ of habeas corpus, whereupon the Court ordered a stay of execution and further ordered respondents to show cause on December 2, 1963, why the writ should not issue as prayed for.

The application of petitioner filed in this Court, composed of twenty-one typewritten pages, originally covered the waterfront, so to speak, in alleging practically every conceivable ground as a basis for the issuance of the writ. The original application, for instance, contained such grounds as incompetency of counsel who had represented petitioner during his trial; systematic token inclusion of Negroes on the grand and petit juries; systematic exclusion of Negroes from the grand and petit juries; systematic exclusion of people of the female sex from the grand and petit juries; improper preparation of petitioner's defense by his four court-appointed attorneys; failure of the district attorney to call a witness who would have given testimony beneficial to petitioner, said witness having since died; the giving of false and incomplete testimony by certain state witnesses to the knowledge of the district attorney; the State of Louisiana

failing to carry its burden of proof in establishing that petitioner's confession was freely and voluntarily given; failure to provide petitioner with legal counsel during police interrogation prior to his indictment for murder. However, at the commencement of the hearing before this Court on the show cause order, counsel for petitioner, in open Court, on behalf of petitioner, abandoned and waived all except three of these alleged grounds. In the final analysis, petitioner chose to stand on three grounds only as the basis for his request for the issuance of a writ of habeas corpus. First, petitioner alleges that the confession given by him was not freely and voluntarily given, and thus was inadmissible in evidence. Secondly, petitioner claims that his confession was obtained in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution because of the fact that the confession was given by petitioner to the police after his arrest, but before his indictment, and at a time when he was not represented by counsel. And thirdly, petitioner alleges that his conviction was obtained in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution in that there was either a systematic inclusion or a systematic exclusion of Negroes from the grand jury which indicted him, and from the petit jury which tried and convicted him. The hearing in this matter was thus confined to these three grounds, all other grounds having been finally, fully, and completely waived by petitioner.

On the night of May 3, 1959, petitioner, while on a drinking party, became involved in an argument with his mother-in-law. He left the party and went to his house in search of his shotgun. His wife, fearing that he, petitioner, might bring harm to someone, went to police headquarters and requested the police to go to petitioner's house and, if possible, take the shotgun away from him. She advised the police that petitioner had been drinking, and that he was looking for his shotgun, which she had hidden in the house. Pursuant to this request, two police officers were dispatched to petitioner's house. They arrived at the house at approximately 10:45 p. m., and as they were proceeding up the front walk, with flashlights, toward the front door of the house, petitioner leveled the shotgun through a crack in the door, and fired point blank, both barrels, into one of the policemen, killing him instantly. Petitioner fled from the house, and was captured at about 5:45 a. m. the following morning, May 4, 1959. He was taken to police headquarters and interrogated by the policeman, whereupon petitioner made a full and complete confession, relating all of the facts leading up to the shooting. This confession was made orally, on a tape recorder, and then transcribed and read back to petitioner, who then signed the typed confession. Petitioner was a colored man, approximately 32 years of age, with a ninth grade education, who could read and write. As his statement was taken orally, in question and answer form, the following subjects, among others, were covered:

"Q. Do you know why you were arrested?

"A. Yes, Sir.

"Q. Why?

"A. Because I shot one of the policemen."

And then later:

"Q. Did the police promise you anything?

"A. No, Sir.

"Q. Did they place you in fear in any way?

"A. No, Sir.

"Q. Did they make any promises to you or threaten you in any way to come here to this office and make a statement?

"A. No, Sir.

"Q. Are you willing to make a statement now?

"A. I am willing to say what I know of.

\* \* \* \* \* \*

"Q. You understand what's been going on here this morning?

"A. Yes, Sir.

"Q. You understand that we are taking this statement from you?

"A. I understand.

"Q. You understand that this statement can be used against you in Court? Do you understand that?

"A. No, Sir.

"Q. You don't understand that?

"A. No, Sir.

"Q. What you have told us here today is the truth is it not?

"A. Yes, Sir.

"Q. Knowing that this statement can be used against you you still willing to make the statement and telling everything is the truth?

"A. Yes, Sir."

Thereafter, his statement, in question and answer form, was reduced to writing and signed by him.

■ A reading of the transcript of the record in this case pertaining to this confession, and a reading of the confession itself, can lead to no other conclusion than that this petitioner full well knew the import of what he was saying and doing, and there is absolutely no indication of any kind that any coercion, intimidation, or threats were used against him in order to obtain this confession. There is absolutely no indication of any kind that this confession was given other than freely and voluntarily by petitioner, nor is there any indication of any kind in this record that petitioner did not fully understand what was going on, what he was doing, and the full import of his confession. Consequently, this Court finds that there is no merit whatsoever to his claim now that his confession was not freely and voluntarily given, or that it was, for any other reason, inadmissible in evidence. The testimony of all of the police officers who were present when petitioner gave his oral confession, as well as the testimony of those present during the signing of the typed confession, leave no doubt that this petitioner was fully advised of his rights, and that he fully understood that he could voluntarily sign this confession if he wished to or that he could refuse to sign it if he so wished. He was asked whether or not he understood that the statement could be used against him in Court, and he, at first, answered "No." He was again asked whether or not he understood that, and he again answered "No." He was then asked whether or not what he had told the officers that day was the truth, and he said that it was. Then, he was asked "Knowing that this statement can be used against you you still willing to make the statement and telling everything is the truth?" and his answer was "Yes, sir." These officers testified that the petitioner was advised that he could have an attorney if he wished one, but that he did not request one. He was further told that he could sign the statement if he wished, and that he could refuse to sign it if he wished. Petitioner could read and write, and his confession was read back to him. He was asked whether or not he wanted to sign it as his confession. He stated that he did, and he then signed it. There is absolutely nothing in this record to even indicate that petitioner's confession was not freely and voluntarily given with full knowledge of the consequences that might flow from it.

The next question is whether or not petitioner's constitutional rights were violated because of the fact that he did not have the benefit of counsel during his interrogation by the police officers after his arrest but before he was indicted.

It must be remembered that this petitioner did have competent counsel from a time prior to his arraignment through-

out all of the entire proceedings against him, up to the present time. At the time he was interrogated by the police officers, he had not been indicted nor charged with any offense. He was merely being interrogated as a suspect. Counsel for petitioner directs the Court's attention to the case of Lee v. United States, 322 F.2d 770 (1963) 5th Cir. In that case, by a two to one decision, the Court of Appeals for the Fifth Circuit held that a confession was invalid where it had been obtained by interrogation of the defendant, *after his indictment,* and at a time when he was not assisted by legal counsel. First of all, it would be sufficient to say that the Lee case is inapposite to this case, because of the fact that in Lee, the defendant had already been indicted, and was thus formally and officially charged with the commission of a crime, before he was interrogated. Thus, even if the holding in Lee was a proper statement of the law, it would not be applicable to the present situation. But even assuming that the holding in the Lee case could be held to encompass the facts of the present case, it is, nevertheless, the opinion of this Court that the Lee case does not properly state the law. In the Lee case, the Court of Appeals first cited Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958), and pointed out that the majority of the United States Supreme Court in that case held that denial of counsel was only one factor in determining the legality of a confession obtained during interrogation, and that it did not, in itself, render the confession involuntary, unless the defendant "is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.'" Also in the Lee case, the majority of the Court cited Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958), which followed the Crooker case in holding that under the circumstances of that case, a confession obtained during a police investigation, after refusal of counsel to the accused, was not necessarily a deprivation of due process. It will be noted that Chief Justice Warren, among others, dissented in Crooker and Cicenia. The majority in the Lee case then went on to cite some *dicta* found in several concurring opinions in Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed 1265 (1959), which *dicta* indicates that *after indictment,* a defendant might be entitled to counsel during police interrogation. Then, taking the *dicta* found in the concurring opinions of Justices Black, Douglas, Brennan, and Stewart, in the Spano case, and combining this *dicta* with the *dissent* of Chief Justice Warren in the Crooker and Cicenia cases, the majority attempts to slip in through the back door when, in light of the majority and controlling opinions in these cases, the front door was securely locked. The reasoning of the majority in the Lee case went like this:

"In view of Justice Warren's dissent in Crooker and Cicenia and the concurring opinions of Justices Black, Douglas, Brennan, and Stewart in Spano, it now appears that a majority of the Justices of the Supreme Court recognize the constitutional right to counsel during police interrogation in cases involving prosecution by the State." 322 F.2d 770 at 775.

This type of reasoning provoked not only a strenuous dissent by Judge Hutcheson, but prompted his "vigorous condemnation" of what he referred to as the "personal decreeing" of the majority of the Court. There is nothing left to doubt in the majority holding in the Crooker and Cicenia cases, which are decisions by the Supreme Court of the United States. To speculate on whether or not, if the Supreme Court were again confronted with the same problem, they might decide it differently, as the majority of the Court did in the Lee case, seems unwarranted and unjustified. I believe that Crooker and Cicenia contain the latest expression of the United States Supreme Court on this subject, and this

Court feels bound to follow that expression of the law as did the Eighth Circuit Court of Appeals in Feguer v. United States, 302 F.2d 214, at page 252 (CA 8 1962).

Therefore, there is no merit to petitioner's contention that there was a violation of due process of law simply because of the fact that he was interrogated by police officers, prior to his indictment, and at a time when he was not represented by counsel. And since there is no other showing in this record that there were any other irregularities in connection with the obtaining of petitioner's confession, this Court finds that there has been no violation of the Due Process Clause of the Fourteenth Amendment in connection with the obtaining and use of this confession.

The third and last ground of attack by petitioner concerns itself with the question of systematic inclusion and systematic exclusion of Negroes from the grand and petit juries in the Parish in which petitioner was indicted and tried. This question is, of course, now raised in practically every case in the State of Louisiana where a Negro is found guilty by a jury of having committed a crime. It is either contended that there were no Negroes on the jury, or, if there were Negroes on the jury, it is then contended that they were purposely put there and that consequently there was an illegal, systematic inclusion of Negroes on the jury. It is fast reaching the point, in view of the developing jurisprudence on this subject, where it will be practically impossible, in many parishes in Louisiana, for a defendant to be legally tried by jury. On the one hand it has been held that fairness in the selection of jurors for jury duty does not require proportionate representation of races upon a jury venire. Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1962 (1945). But then, in United States ex rel. Seals v. Wiman, 304 F.2d 53 (CA 5 1962), it was held that if Negroes are not included on jury venires in numbers somewhat proportionate to the number of their race in the community, that it will be more or less assumed that there is discrimination being practiced. And then, again, it has been held that if any kind of conscious effort is made to be sure that Negroes are properly represented on a jury venire, that, too, amounts to discrimination because, as the Fifth Circuit Court of Appeals has said, the Negroes are then being placed on the jury "because they are Negroes and not because they are men." Collins v. Walker, 329 F.2d 100 (CA 5 1964).

It must be remembered that particularly in the smaller parishes in Louisiana, it is next to impossible for jury commissioners to select names of prospective jurors without knowing whether the names selected belong to members of the Negro race or to members of the white race. In these smaller parishes and smaller communities all people are pretty well acquainted with each other. Furthermore, in these small rural parishes, it is common knowledge that a far greater proportion of Negro citizens are illiterate, uneducated, and unable to meet the qualifications of jurors than is to be found among members of the white race. It further must be remembered that it is the duty of the jury commissioners to make sure that only qualified persons are selected for jury duty. It has been said in several cases that the Constitution is color blind. But I do not believe it can be said that jury commissioners are also expected to be color blind. The jury commissioners in these areas are placed in an almost untenable position. In the Collins case, for instance, there was an honest, conscientious effort made by the public officials in the parish involved to make sure that they complied with what they understood, and reasonably so, to be the requirements, as proclaimed by the United States Supreme Court, of due process with regard to the selection of juries. They made every effort, in exceedingly good faith, to see that Negroes were properly and adequately represented on the jury panels

involved. But then, because they made this effort, the conviction and sentence was set aside on appeal on the ground that the jury commission had no right to include Negroes because they were Negroes, even though they were qualified Negroes, but they must include them with complete disregard of their race. Apparently, the members of the jury commission must select prospective jurors blindfolded, lest they otherwise find out the race of the prospective jurors. I must confess that if these decisions are followed to the letter, I am at a loss to know how it is possible, particularly in these rural areas, to select a jury that would meet the requirements of due process of law. There is a certain discretion that must be left to the jury commissioners in the selection of juries if they are to perform their function in accordance with law. Unless a petitioner can show that there was a conscious, unreasonable, and prejudicial exclusion of qualified Negroes from jury service, it seems to me that he should not prevail in his claim that he has been denied due process of law.

■ In the instant case, the testimony of all of the jury commissioners was taken by deposition, and the Court has carefully studied this testimony. While it is apparently true that the number of Negroes whose names have appeared on the grand jury and the petit jury venire lists in Acadia Parish are fewer in number than the proportion of Negroes to whites living in the community, nevertheless, this Court concludes that petitioner has fallen far short of showing an intentional, unreasonable or prejudicial systematic exclusion or inclusion of Negroes from these jury lists. From the evidence in this case, it is the opinion of this Court that petitioner's constitutional rights have not been violated in this regard.

For these reasons, petitioner's application for the issuance of a writ of habeas corpus will be denied.

Judgment will be entered accordingly.