STATE, PLAINTIFF, *v.* PUCKETT, DEFENDANT.

Common Pleas Court, Paulding County.

No. 2785. Decided September 3, 1964.

*Mr. John F. DeMuth*, prosecuting attorney.
*Mr. Douglas W. Brown*, for defendant.

HITCHCOCK, J.   Defendant has filed a motion for a Writ of Habeas Corpus.   He contends that the writ should be granted upon the authority of *Escobedo* v. *State of Illinois*, 84 S. Ct., 1758, decided June 22, 1964.   In this case a majority of five justices of the Supreme Court of the United States (with four justices dissenting), reversed an Illinois conviction for murder by holding that: where the investigation is no longer a general inquiry into unsolved crime but has begun to focus upon a particular suspect, the suspect has been taken into police custody,

the police carry out process of interrogation that lends itself to eliciting incriminating statements, the suspect has requested and been denied opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied assistance of counsel in violation of the Sixth Amendment as made obligatory upon the States by the Fourteenth Amendment, and no statement elicited by the police during interrogation may be used against him at criminal trial.

Because of the novelty of the cited precedent the court has carefully considered defendant's application, after hearing testimony and argument in respect thereto, and has examined the precedents without purpose of evasion.

In his application defendant says he "is imprisoned and restrained without any legal authority for the reason that he was denied the right of assistance of counsel at a critical stage in a criminal proceeding, to-wit: preliminary hearing and prior thereto in violation of the due process clause of the 6th and 14th Amendments to the Constitution of the United States and in violation of Article I, Section 10 of the Constitution of the State of Ohio, whereby the action of the County Court of Paulding County, Ohio, is utterly void."

The transcript of record from the County Court shows that on Monday, August 3, 1964, Edward Rosselet (Police Chief) made affidavit that on August 2, 1964, defendant, in the night season, attempted to maliciously and forcibly enter a specified uninhabited storehouse with intent to steal in violation of Section 2907.10, Revised Code. That a warrant to arrest was issued and returned by the Sheriff, also on August 3, 1964, and that the cause was set for hearing at 7.:30 P. M., this same day.

That the cause was on August 3, 1964, upon application of the defendant, continued to August 5, 1964, at 10:00 A. M. Thereupon the County Court set bond at $1,000 cash or $2,000 property. No recognizance being given, defendant was committed to the keeper of the jail on August 3, 1964. On August 5th defendant was arraigned and plead "not guilty." Thereupon, in open court, witnesses were sworn and examined on behalf of both the state and the defendant. At the conclusion of the testimony, defendant was bound over to the Grand Jury. Being still unable to make bail, he was returned to the jail.

The evidence at the hearing in this court (conducted with the reporter, the prosecuting attorney, the defendant, and his counsel in attendance) is clear and uncontroverted that the alleged offense occurred in the early morning of August 2, 1964. That the police, having reason to suspect defendant, looked for him but were unable to find him. They did find his automobile which was removed to another place. Some hours later, on Sunday, August 2, 1964, defendant visited the Sheriff to report his missing automobile and was thereupon taken into custody for the police. While defendant was in the jail on August 2 and 3, the Sheriff permitted him to communicate with his wife and wife's mother and these persons attempted to obtain an attorney for defendant, but were unsuccessful.

That upon arrival in County Court about 7:00 P. M., Monday, August 3, 1964, defendant asked the judge to appoint a "pauper's attorney" for him. The County Judge was unable to discover any law giving him authority to appoint or to pay counsel in these circumstances. He did continue the case until Wednesday to give defendant further opportunity to secure counsel. Defendant, being unable to procure counsel by 10:00 A. M., Wednesday, August 5, 1964, the court proceeded with the arraignment, entering a plea of "not guilty," hearing the sworn testimony of the police chief and the defendant, whereupon the court bound defendant over to the Grand Jury.

Defendant testified that from the inception of his incarceration he was permitted to communicate with his wife and mother-in-law and did so; also, that from and after the time he first requested counsel he was not questioned about the alleged offense by anyone from the Police Department or Sheriff's office. Also, that prior to that time and afterward defendant never admitted having any connection with the alleged offense. Also, the prosecuting attorney, at the hearing stated that he was unaware that enforcement officials had obtained any incriminating admissions of any kind from defendant, which corroborates defendant's testimony that he never admitted to anyone any connection with the alleged offense.

The transcript of the record from the County Court was filed in this court on August 6, 1964. At defendant's request, communicated to this court by the Sheriff, this court on August 7, 1964, appointed Douglas W. Brown, Esq., to be counsel for

defendant. On August 11, 1964, this hearing was held as scheduled at which time aforementioned evidence was adduced and arguments of counsel were heard. At the same time an oral motion to reduce bail was heard and same was reset at $300 cash deposit. Thereupon defendant's family made this deposit and defendant was released.

In this case, as in *Escobedo*, the investigation had begun to focus on defendant, he was taken into police custody and subjected to some questioning; and enforcement officials did not warn him of his absolute constitutional right to remain silent. Unlike *Escobedo*, the police failed to elicit from defendant any incriminating statements, never denied him facilities for the purpose of attempting to retain counsel, and never questioned him after he asked the judge of the County Court for appointment of an attorney.

In these circumstances, the court cannot see how defendant has in any way been denied any of his constitutional rights, either under the latest interpretation of the Constitution of the United States, or under the Constitution of Ohio (see *Dean* v. *Maxwell*, 174 Ohio St., 193, 187 N. E. (2d), 884 [1963]). Here there is not the slightest attempt by the police, sheriff's office or the Judge of the County Court, to deny counsel to defendant, or evidence that anything happened to prejudice defendant's defense at trial should the Grand Jury indict him.

The facts here seem to fall clearly and well within the rule of *Crooker* v. *California*, 357 U. S., 433, 78 S. Ct., 1287, 2 L. Ed. (2d), 1448 (1958), which is discussed in the majority opinion in *Escobedo*, where it was distinguished as not in conflict with the rule announced, in these words: (at 84 S. Ct., 1765).

". . . In that case the Court merely rejected the absolute rule sought by petitioner, that 'every state denial of a request to contact counsel (is) an infringement of the constitutional right *without regard to the circumstances of the case*. Id. 357 U. S., at 440, 78 S. Ct., at 1292. (Emphasis in original.) In its place, the following rule was announced:

'(S)tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, * * * but also if he is deprived of counsel for any part of the pretrial proceedings, provided that he is

so prejudiced thereby as to infect his subsequent trial with an absence of "that fundamental fairness essential to the very concept of justice." * * * The latter determination necessarily depends upon all the circumstances of the case.'

357 U. S., at 439-440, 78 S. Ct., at 1292. (Emphasis added.)"

At this time I feel that fidelity to my oath of office justifies —if it may not absolutely require—the statement of several observations in behalf of what I conceive to be the truth.

The first is that I believe that a majority of the justices of the Supreme Court of the United States have, in recent years, erred grievously in finding, after more than a century and a half, that their present concepts of the provisions of the Bill of Rights of the Constitution of the United States, in nearly every conceivable detail, are applicable to the States. The Court has more than once complained that new cases, if of first impression, would be decided differently. I answer with the conviction that if the meaning which has been read into the 14th Amendment during the past 25 years had been generally proclaimed in the 1860's, the 14th Amendment would never have been adopted. Moreover, how anyone with any substantial knowledge of our history can have a truly honest belief that had these ideas been thus publicized our people would nevertheless have adopted the 14th Amendment, escapes me. Does it not ill behoove men who explicitly are only vested with "judicial power" and who are called justices, to amend fundamental law by fiat, without the vote of a single citizen or legislator?

To me it seems that our history irrefutably establishes the fact that our forefathers clearly understood that the States were to chiefly control our daily affairs and that the national government was to be one of delegated powers—not omnipotence. The grand design was to preclude a tyrannical national government—not to create completely impotent State governments. The founders' purpose was to "secure the Blessings of Liberty to ourselves and our Posterity." They succeeded so marvelously that no country in all the world has ever had, or today has, the immigration problems that confront us.

Yet time and again, in recent years, I perceive a majority of our Supreme Court justices to have found some pretext for invalidating state action, in the face of overwhelming proof of criminal acts, by ignoring the 9th and 10th Amendments, and

stretching grammatical logic to a nonsensical absurdity—while apparently caring not one whit for the considerations of practical wisdom which for well over a dozen decades enabled our States to punish vice and maintain some order over our predatory criminal forces. Now this is largely gone. Respect for law and order declines. Crime rates climb in total and in incidents per 1,000 population. I am forced to wonder just what can be done so long as the attitude of the Court's majority continues to be what it recently seems all too often to have been: "You don't count. Your situation doesn't count. History doesn't count. The states don't count. Congress doesn't count. Only our decision by five or more justices counts! And regardless of your desires or the realities of practical, everyday affairs, these predators who peddle narcotics, commit murder, rob, rape, defraud, steal, embezzle, distribute obscenity, and do all manner of forbidden things must be released to do it again and again!"

In view of numerous recent decisions of the Court it does not surprise me that today many policemen wonder if law enforcement is worth it. That crime rates soar. That total crime increases. Has anyone calculated the extra-ordinary financial burden the Court has thus put upon the States? To benefit hardly anyone except vicious predators and evildoers—so more citizens striving to live uprightly may be victimized? Of course, occasionally an innocent person is benefited—and such persons deserve our consideration and our judgments of innocence. But just where is the administration of justice so perfect that *no* innocent person is convicted? Does the fact that in our system, as in others, there are some miscarriages of justices justify our Supreme Court in amending our Constitution in fundamental effect, through interpretation, without the vote of a single citizen or legislator? And especially in cases where the problems dealt with are old ones and not ones of recent origin because of new technology? In my search for answers, I am unable to discover where this wholesale meddlesomeness has been authorized by the people of the United States, or the States of our union, or a line of our history.

For me the present majority speaks as clearly as Humpty Dumpty did to Alice in Wonderland:

"... 'When I use a word,' Humpty Dumpty said in a rather

scornful tone, 'it means just what I choose it to mean—neither more nor less.'

" 'The question is,' said Alice 'whether you *can* make words mean different things.'

" 'The question is,' said Humpty Dumpty, 'which is to be master—That's all' . . ."

In reading and reflecting upon many of these cases I have asked myself if this attitude does not show as little true respect for our Constitution as Adolph Hitler showed for the German Penal Code when he caused it, on June 28, 1935, to be revised to read:

"Article 1, Section 2. Any person who does an act which the law declares to be punishable or which is deserving of punishment according to the basic principles of a criminal statute *and according to healthy public sentiment,* shall be punished. . . ."

It is with deep regret that to this date I have been unable to perceive any essential difference in philosophy. For me any criminal code resting upon any one man's notions of "healthy public sentiment" is unsatisfactory and can never be long tolerated by free men. In like manner, I find most unsatisfactory a Constitution of fundamental law which seems to have become no more than the personal notions (no matter how exalted or high minded) which five men have of what constitutes "healthy public sentiment."

If the words "judicial power" as found in the first line of Article III, Section 1 of the Constitution of the United States since the day of its drafting have come to mean "all power it determines to exercise" ought not this fact be proclaimed to and acknowledged by every citizen? When this is done will it not be appropriate for all of us to urge our dictionary publishers to assemble a convention of prostitutes and commission them to prepare for us an up-to-date definition of the word "virtue?"

Perhaps, of course, my sight is unclear, my perception deficient, or my understanding faulty. It may be that my 10 years experience in law enforcement activity and my acquaintanceship with hundreds of peace officers and hundreds of malefactors warp my view of the present situation. Perhaps our modern society needs less "government of the people, by the people, and for the people" and more "government of the jus-

tices, by the justices, and for their partisans''—particularly where they are not subject to elections and have never been given a definition of ''good behavior.'' If the Congress and the States no longer have any truly essential functions is there any valid reason for continuing a fiction that they have? If I correctly understand the present majority (along with what seems to me to be their carnival barking supporters in the press) these recent decisions of the Court are necessary to keep the clock on time. To me it seems they are an attempt to turn it back to some pre-1789 day when all governmental power was free from constitutional separations and limitations and determined only by *the arbitrary will* of persons in power.

Perhaps today, in order to preserve our republic and to secure to ourselves and our posterity the blessings of liberty we should, or we need to, put our faith in a majority of the justices of the Supreme Court and in all the other federal judges who must follow them. As yet I remain unconvinced that I am wrong in putting my faith where the founding fathers, where Lincoln, where nearly all the justices of the Supreme Court, where Learned Hand, and where millions of our citizens have put theirs—in the hearts, minds, and hands of the free people of the several States and in their ultimate sense of decency, of good, and of right. That this may today differ from my own personal present sense of what is better or is perfect in no way affects my conclusion that presently and in the long run there is nothing better in which any free man can put his political faith. Especially when we observe a Constitution which provides shock absorbing protection against the rule of tyrants which has often resulted from temporary convulsions in public sentiment.

And now, within the past three months, the citizens of more than 40 States have been told that their State Constitutions are unconstitutional! Even where a majoriy of the states' electors have, within the past decade, adopted or approved their own State Constitution! Is freedom not seriously impaired when millions of free men are suddenly directed to order their basic governmental affairs in conformity with notions held by five men as to what is ''rational?'' And despite practical consequences and personal desires? As men have for centuries often acted irrationally I cannot help but wonder just how

"rational" it is for judges who are indubitably vested with "judicial power" to forthrightly assume to exercise political and legislative power while calling what they have done an exercise of judicial power. Depriving millions of free men of the freedom to act irrationally when they deliberately choose not to act rationally—as determined by five men responsible to no electorate—strikes me as being a peculiarly unjustified and unjustifiable business. Certainly such deprivation must be fraught with numerous consequences likely to be more pernicious than those some believe to have been eliminated.

No doubt we will always have change and will always need change in our law but that is surely not law that is changed at a rate such that our best lawyers can't discover what it is. It is my hope that we will always clearly perceive what it is we are changing and effect only changes which in days to come will continue to secure the blessings of liberty to our posterity, and will be found by them to have been wise and good. Believing that freedom with enough stability to enjoy it is the greatest good, it is my earnest hope that unwise changes will always be detected before permanent harm is done so that free men may take corrective action before they have lost their freedom. Are not a few lands today witness to the miseries of freedom lost? It seems certain to me that such people will seldom, if ever, regain their freedom without a bloody and costly struggle. The lesson of the old fable of the mice who would bell the cat is ever with those of us who analyze the nature of freedom over the years.

Although I have considered a variety of ways that I might avoid it, I must conclude that the present Court cannot escape responsibility for too large a share in the condition reflected in this table from "Uniform Crime Reports for the United States—1963 Edition for release July 20, 1964—issued by the Federal Bureau of Investigation, United States Department of Justice," in respect only to offenses known to and reported by the police agencies, at page 4:

Chart 1

As one who has long been an observer of the Court and its work and a citizen proud of its generally exceedingly honorable function under our Constitution, I repeat that I truly regret that my observation and reasoning lead me to the foregoing conclusions. Nevertheless, I believe we trial judges have some responsibility to set down our views at least once when we are convinced something sorely needs be said.

Finding the defendant in no way prejudiced in the enjoyment of his constitutional rights by what occurred here, his application for a writ of habeas corpus must be denied. Judgment accordingly is entered upon the journal.