Commonwealth v. Guy

*Robert W. Duggan*, District Attorney, *David O'Hanesian*, Assistant District Attorney, *George I. Miller*, Assistant District Attorney, and *Louis Abromson*, Assistant District Attorney, for Commonwealth.

*McArdle, Harrington, Feeney & McLaughlin*, for defendant.

ALDISERT, J., January 4, 1966.—Defendant comes before us with several petitions seeking to quash the indictment and, in the alternative, to suppress certain oral and written statements of defendant, and to suppress certain items of physical evidence.

Defendant contends his constitutional right of privacy guaranteed by the Fourteenth Amendment to the Constitution was violated by an illegal search of his hotel room by the Pittsburgh police, and that, therefore, certain evidence in the possession of the Commonwealth obtained during that search should be suppressed, and further alleges that the preliminary arrest and hearing processes before the coroner were illegal.

Lengthy hearings were conducted on these petitions, extending some four days. It would appear from the testimony that the Pittsburgh police received a call at approximately 6:01 a. m. on March 31, 1965, indicating that a body, later identified as that of a certain Alfred Price, was lying on a subroof of the Pittsburgh Hilton Hotel. An ambulance manned by two police officers arrived at the hotel at approximately 6:15 a. m. The officers proceeded to the fourth floor roof of the hotel and found the body of Mr. Price lying face down surrounded by pieces of broken glass. A visual

inspection of the hotel exterior from this point disclosed that a window on the ninth floor was broken, with portions of a venetian blind protruding therefrom. This window was directly above the spot where the body came to rest. The officers conferred with representatives of the hotel and determined that the room with the broken window was room 933. The chief engineer of the hotel accompanied the officers to the room and admitted them through the use of a pass key. Upon entering the room, the officers found the room in disarray and defendant lying in bed, asleep. The officers inspected the room, awakened defendant and, at approximately 6:45 a. m., sent him to detective headquarters under custody.

Immediately thereafter, a search of the room was initiated, resulting in the seizure of certain articles belonging to defendant and certain articles belonging to the hotel, both types of which the defense is seeking to suppress.

Petitioner was placed in a matron's room in a building then known as No. 1 Police Station, which also then housed the homicide squad of the detective division. At approximately 9 a. m., various members of the homicide squad began an interrogation of petitioner. They first brought him to the identification bureau for the purpose of having a picture taken. Petitioner refused, and the detectives did not persist at that time.

At the hearing before us, there was a conflict of testimony as to what then occurred. It is petitioner's version that after telling him that Mr. Price was dead, the detectives wanted to obtain a statement from him: that he was not advised that he had the right to call an attorney. Petitioner concedes, however, that prior to the institution of the interrogation, the detectives told him that he had the right to refuse to answer any question put to him by them. Petitioner contends, however, that he asked for the right to call a certain Attorney

John McFall in petitioner's home town of Lubbock, Texas, which request was refused.

It is the version of Detectives Terczak and McDermott that they advised him of his constitutional right to remain silent, and that they further notified him that he had a right to consult counsel, but petitioner responded that he had been a cadet at West Point for three years, that he was familiar with his rights, and, inasmuch as he had lived under the honor code at West Point, he felt he should give a statement and tell the truth, and to do this he did not need the advice of counsel. It is conceded that petitioner did spend three years at West Point, received a bachelor's degree from one university and holds a master's degree from another.

Petitioner then gave an oral statement. All detectives testified that he was most cooperative, except for the first incident of refusing to be photographed. He was permitted to talk by telephone with his mother in Texas, wherein he asked her to communicate with Attorney McFall. This was approximately 1:05 EST on March 31st.

At 2:45 p. m. that same day, Attorney McFall in Texas placed a telephone call to the homicide squad in Pittsburgh and talked with the officer in charge, Captain (now Assistant Superintendent) Eugene Coon, and requested the opportunity of talking on the phone with petitioner. This request was refused. The detectives did not tell petitioner that Attorney McFall had called.

Later that evening, petitioner was examined informally by Sgt. Louis Hamel, and was brought to No. 9 Police Station to spend the night. The next morning, April 1st, he was returned to detective headquarters and a written statement was obtained. There is a conflict of testimony as to the taking of this statement, petitioner insisting that he was told he could see an attorney only after he gave and signed a written state-

ment, and the detectives stating that he willingly made the statement.

Following the making of this written statement, petitioner was permitted to talk by phone with his mother, *who had called from Texas,* and was also permitted to talk in person with Attorney McFall who had just arrived in Pittsburgh.

No written complaint was signed charging petitioner with any crime, although he was orally informed that he was being held on a homicide charge resulting from the death of Mr. Price, and that he would be turned over to the Coroner of Allegheny County for further disposition.

The next day, April 2nd, he was brought to Coroner Joseph B. Dobbs, who committed him to the Allegheny County Jail. On April 9, 1965, a public inquest was held where petitioner was represented by counsel, who participated actively in the proceedings, and as a result of a finding by the coroner's jury, petitioner was remanded to jail to await the action of the grand jury on a charge of murder. He was later released on bail.

## MOTION TO QUASH

Although not treated in petitioner's brief, which is unexplainably limited to a discussion of search and seizure, it is first necessary to consider the motion to quash the indictment predicated on all allegations.

1. No written complaint was filed as required by Pennsylvania Rule of Criminal Procedure 102.

2. Petitioner was not afforded a preliminary arraignment as required by Pa. R. Crim. P. 116.

3. Petitioner was not afforded a preliminary hearing.

In essence, these arguments constitute a general challenge of the power and authority of the office of the Coroner of Allegheny County to function as a committing magistrate. To evaluate these arguments prop-

erly, it is necessary to examine this office from an historical and constitutional perspective.

The Pennsylvania Constitution authorizes the office in article XIV, sec. 1: "County officers shall consist of Sheriffs, coroners . . ." (Constitution of 1874), but does not enumerate the duties. We must, therefore, look to the law of Colonial Pennsylvania prior to the adoption of our Constitution in this State to inquire of the duties.

The office of coroner is discussed in detail in the "Report of the Judges of the Supreme Court of the Commonwealth of Pennsylvania, made in pursuance of an Act of the General Assembly of the said Commonwealth, passed the 7th day of April, 1807. Reported to the Senate and House of Representatives on the 19th and 20th of December, 1808". This report is also known as "Digest of Select British Statutes", by Samuel Roberts, President Judge of the Court of Common Pleas of the Fifth Judicial District of Pennsylvania (Allegheny County): Roberts' Digest, 2d ed. 1847.

It is there reported that the historical Statute De Officio Coronatoris, 1276, 4 Edw. 1, c. 2, was in force first in the colony of Pennsylvania and later in the Commonwealth.[1]

In Commonwealth v. O'Brien, 181 Pa. Superior Ct. 382, at page 391, the court observed:

"Doubt having arisen after a few years as to which English statutes were applicable to the new government and which should be considered as a part of the law of this Commonwealth, the legislature, by the Act of April 7, 1807, directed the judges of the Supreme Court to report to the legislature which of the English statutes were then in force in this Commonwealth. In the report made by the judges found in the appendix

---

[1] See Roberts' Digest, pages 100, 101, infra.

of 3 Binney's Report, 616, 620, there were included three of the above acts: the statute of Third Henry VII, Chapter 3, the statute of First and Second Philip and Mary, Chapter 13, and the statute of Second and Third Philip and Mary, Chapter 10. These statutes thus became a part of the law of this Commonwealth, and constitute the basic authority for our preliminary hearings".

To these three acts, we add, of course, De Officio Coronatoris, which became a part of the law of this Commonwealth and constitutes the basic authority of the office of coroner in Pennsylvania, setting forth not only the powers of this office, but also the duties and responsibilities, except as subsequently modified by statute. (Footnotes follow paging of second edition of Roberts' Digest):

### "CORONER.

### "4 EDWARD I. STAT. 2. A.D. 1276.[1]

*"Concerning the duty of a Coroner. Of what things a coroner shall inquire.*

"A CORONER of our lord the king ought to inquire of these things, *if he be certified by the king's bailiffs, or other honest men of the country:* First, he shall go to the place where any be slain or suddenly dead or wounded, or where houses are broken, [*or where treasure is said to be found*] and shall forthwith command four of the next towns, or five or six, to appear before him in such a place; and when they are come thither, the coroner, upon the oath of them, shall inquire in this

---

"[1] This statute is in force, except those parts which relate to the coroner's duty in the following points, viz., making inquiry as to the property of any person, or seizing the property of any person—treasure that is found—appeal of rape, or wounds, or any other appeals, deodands—and wrecks of the sea—and also except that part which provides, that land shall remain in the king's hands until the lords of the fee have made fine of it.—*Report of the Judges.*"

---

"9 Hen. 3, c. 17—3 Ed. 1, c. 10. * *Instead of the words in italics,* read *first when coroners are commanded by the king's bailiffs, or by honest men of the county, they shall go,* &c. † Add *if it concerns a man slain, whether they know,* &c. ‡ Add *if any and who,* &c. § Add *and in what manner culpable.* ‖ For *in rolls,* read *in the rolls of the coroners.* ¶ Read *in the fields or woods and be there found,* &c. ** Read *there.* †† Read *or of the horse which brought him or cart, if perchance he was brought upon a horse or cart.*"

manner, that is to wit, If † they know where the person was slain, whether it were in any house, field, bed, tavern, or company and ‡who were there:

"Likewise it is to * be inquired, who were § culpable either of the act, or of the force, and who were present, either men or women, and of what age soever they be (if they can speak, or have any discretion;) and how many soever be found culpable by inquisition in any of the manners aforesaid, they shall be taken and delivered to the sheriff, and shall be committed to the jail; and such as be founden, and be not culpable shall be attached until the coming of the justices, and their names shall be written ‖ *in rolls*. If it fortune any such man be slain, ¶ *which is found in the fields or in the woods*, first, it is to be inquired, whether he were slain ** *in the same place* or not; and if he were brought and laid there, they shall do so much as they can to follow their steps that brought the body thither, †† *whether he were brought upon a horse, or in a cart:*

"It shall be inquired also, if the dead person were known, or else [p. "100-101" of second edition ends here] a stranger, and where he lay the night before, and immediately upon these things being inquired, the bodies of such persons being dead or slain, shall be buried.

"II. In like manner it is to be inquired of them that be drowned, or suddenly dead, and after * *such bodies are to be seen*, whether they were so drowned or slain, or strangled by the sign of a cord tied straight about their necks, or about any of their members, or upon

---

* Read *it is to be seen of such bodies*, &c. Appeals of wounds or maim—Rast. 45. † For *defendant*, read *offenders*. ‡ Read *if the parties hurt*. § Read *the offenders*. ‖ For *no less than*, read *more than*. ¶ Add *without maihem*. ** Add *the wound is given*. †† Read *and if there are many wounds, who gave each particular wound*.— See 28 Ed. 3, c. 6, *for election of coroners*. 3 H. 7, c. 1, *which inflicts penalty on coroners being remiss*. And 1 H. 8, c. 7—1 & 2 P. & M., c. 13, §5—25 Geo. 2, c. 29, *which contain further regulations respecting coroners*."

"(a) On *certiorari* the court on the application of the crown, set a coroner's inquest aside for defects apparent on the face thereof.—5 Barn. & Adolph. 230. 27 E. Com. L. Rep. 71."

any other hurt found upon their bodies, whereupon they shall proceed in the form abovesaid; and if they were not slain, then ought the coroner to attach the finders, and all other in the company. Upon appeal of wounds and such like, especially if the wounds be mortal, the parties appealed shall be taken immediately and kept until it be known perfectly, whether he that is hurt shall recover, or not; and if he die, the † *defendant* shall be kept; and if ‡ *he* recover health, § *they* shall be attached by four or six pledges, after as the wound is great or small. If it be for a maim, he shall find ‖ *no less than* four pledges; if it be for a small wound, ¶ two pledges shall suffice. Also all wounds ought to be viewed, the length, breadth, and deepness, and with what weapons,** and in what part of the body the wound or hurt is, and * how many be culpable, †† *and how many wounds there be, and who gave the wound*; all which things must be enrolled in the roll of the coroners. If any be suspected of the death of any man being in danger of life, he shall be taken and imprisoned, as before is said. In like manner hue shall be levied for all murders, burglaries, and for men slain or in peril to be slain, as otherwhere is used in England, and all shall follow the hue and steps, as near as can be; and he that doth not, and is convict thereupon, shall be attached to be afore the justices of the jail, &c. *(a)*"

From the statute itself, the power to commit is precisely provided for:

"Likewise it is to be inquired, who were culpable either of the act, or of the force, and who were present . . . and how many soever be found culpable by inquisition . . . they shall be taken and delivered to the sheriff, and *shall be committed to the jail* . . ."

It is further provided:

". . . especially if the wounds be mortal, the parties appealed shall be *immediately taken and kept* . . ." (Italics supplied.)

At page 104 of the Judges' Report, the following commentary appears:

"In the construction of the statute in the text (4 Edw. 1, st. 2) commonly called the statute De Officio Coronatoris, the following points seem to be agreed upon:—That the statute being wholly directory, and in affirmance of the common law, the coroner is therefore not restrained from any branch of his power, nor excused from any part of his duty, not mentioned in it, which was incident to his office before; and therefore, though the statute mentions only inquiries of the death of persons slain, drowned, or suddenly dead, yet the coroner ought also to inquire of the death of those who die in prison".

It, therefore, appears that the coroner has had the power and duty of a committing magistrate for at least 689 years, and probably longer.

Moreover, this power antedates that of any justice of the peace. This officer, called magistrate in Philadelphia and alderman in other cities, is first described in a statute of 1326, 1 Edw. 3, Stat. 2, c. 16, in which he is assigned to "keep the peace". Later on in Edward's reign, the magistrates were empowered to "take and arrest all those they may find by indictment or suspicion and put them in prison": Justices of the Peace Act, 1360, 34 Edw. c. 1.

It will also be noted that the reception of testimony at the coroner's inquest, or hearing, differs substantially from that received at a hearing before a justice of the peace. In the latter proceeding, it is only that the testimony of the Commonwealth which is required to be presented, the sole purpose being to determine whether a prima facie case has been established. The accused does not have the right, as a matter of law, to present his testimony or the testimony of other witnesses at such preliminary hearings relating to "murder, manslaughter, arson, rape, mayhem, sodomy,

buggery, robbery, or burglary . . .": Act of May 14, 1915, P. L. 499, sec. 1, 42 PS §1080.

At a coroner's inquest, however, it is the responsibility of the coroner to receive *all the testimony, both that presented by the Commonwealth and by the defense.* One accused of crime, and turned over to the coroner by the police to await an inquest, has the right to be confronted by those witnesses appearing against him, presented by the Commonwealth in establishing a prima facie case against him, as well as to have his witnesses heard at an open hearing, or inquest.

In Roberts' Digest (2d ed.), we observe this commentary at page 105:

"The coroner's inquest must hear all the evidence offered to them on oath, whether against, or in favor of the accused, for it is not so much an accusation or indictment, as an inquest of office, and therefore, the difference in the penning of the Act of 1 & 2 P. & M., c. 13, touching the examination taken by the justice of the peace and the coroner is observable: The justices of the peace are to put in writing the information against the felon, of the fact and circumstances thereof, *or so much thereof as shall be material to prove the felony;* but the coroner is to put in writing *the effect of the evidence given to the jury before him, being material,* without saying *so much as is material to prove the felony,* but the *whole* evidence given whether to prove or disprove the felony". [2] (Italics in original.)

---

[2] This is the statute of 2 and 3 Philip and Mary, chapter X, referred to in Blackstone in Vol. IV, page 296, as the basis for the preliminary hearing before a justice of the peace. He there describes the procedure followed in his time in this language:

"The justice before whom such prisoner is brought is bound immediately to examine the circumstances of the crime alleged . . . If upon this inquiry it manifestly appears that either no such crime was committed or that the suspicion entertained of the prisoner was wholly groundless in such case only is it lawful totally to dis-

Viewed in this historical perspective, we now consider the specific arguments advanced by petitioner.

## FAILURE OF COMMONWEALTH TO FILE WRITTEN COMPLAINT

Petitioner contends the indictment is defective because of the failure of the Commonwealth to file a complaint in accordance with rule 102 of the Pa. R. Crim. P.: "Except as otherwise provided in these rules, all proceedings shall be initiated by a written complaint, sworn to or affirmed, and subscribed by an affiant".

A reading of this rule in association with the other related rules, i.e., rules 104-08, 113-17, 120, 122, 124-26, presupposes that the institution of all criminal proceedings will be before a justice of the peace, a magistrate or a judge of a court of record. The rules make no mention of the procedure to be followed by the coroner's office which is both an investigative and judicial office.

The specific question then before us, more properly stated is: Must a complaint be filed before a coroner, investigating a death in his county, may have jurisdiction to hold a suspect, arrested without a warrant, for grand jury action? This must be answered in the negative.

A complaint is the initial step in the prosecution, and delineates the charge against the accused. It is the preliminary charge or accusation against an offender made by a private person or an informer to a justice of the peace or other proper officer, charging that the accused has violated the law; and its purposes are to advise the accused of the charge made against him, and to enable the committing magistrate to determine

charge him. Otherwise he must be committed to prison or given bail": Commonwealth v. O'Brien, 181 Pa. Superior Ct. 382.

whether or not the accused should be bound over to stand trial for the offense charged. Sometimes a complaint is an "oral charge . . . made to a proper magistrate or court . . . which is to be reduced to writing by the magistrate or court . . .": 22 C. J. S. §303, Criminal Law.

The complaint is the foundation of the jurisdiction of the magistrate: 22 C. J. S. §303(a), Criminal Law. The want of a sufficient complaint goes to the jurisdiction of the court which must take notice thereof ex mero mota and render all proceedings prior to the filing of a proper instrument void ab initio: 22 C. J. S. §303(b), Criminal Law.

A justice of the peace or a magistrate has no authority in his own right to determine from the facts whether or not sufficient cause exists to issue a warrant or to hold the accused for court except by examining the face of the complaint lodged against the accused. The justice of the peace or magistrate has no authority to hold the accused if the complaint does not state a prima facie case on its face. The authority of the justice of the peace or magistrate differs from the authority of the coroner in two important respects:

First, the power of the coroner to act does not rest on the foundation of a written complaint, filed or signed by another. Since 1276 A. D., the coroner has been charged with the *duty* to investigate unnatural deaths occurring within the county and to commit to jail those found responsible for the killing, to stand trial at the next term of court.

Second, the office of coroner is a quasi-investigative office. The coroner has the power to summon and command the attendance of any person having knowledge of the facts and circumstances surrounding the death he is investigating.

A coroner receives and considers testimony of both the Commonwealth and the accused in determining the

identity, if any, of the person responsible for the death of the victim.

The findings of a coroner are, in effect, a formal charge lodged against the accused which he is required to answer at the next term of court. In this regard, a criminal proceeding is instituted other than by complaint. To hold that the jurisdiction of the coroner rests upon the filing of a complaint by another would circumscribe the duties and responsibilities of that constitutional office. This we may not do by a judicial decree.

Inasmuch as the Pennsylvania Rules of Criminal Procedure were promulgated by the Supreme Court, it must be presumed that a practicable and reasonable interpretation is intended. By limiting the necessity of a formal written complaint in a homicide to cases other than those before the coroner, which we now do, we observe both the spirit of the new Rules of Criminal Procedure without doing violence to the ancient authority of the coroner whose office is created by the Constitution, and whose substantive powers, duties and responsibilities hearkening back to such antiquity, may be modified directly only by the legislature within the framework of the Constitution, and not indirectly by court promulgated rules of procedure.

PRELIMINARY ARRAIGNMENT

Pennsylvania Rule of Criminal Procedure 116(a) provides:

"When a defendant has been arrested, with or without warrant, in a court case within the county where the complaint has been filed, he shall be taken without unnecessary delay before the proper issuing authority for preliminary arraignment".

Petitioner contends that he was not afforded a preliminary arraignment. We disagree. We hold that his appearance before Coroner Dobbs on Friday, April 2nd, prior to his commitment to the Allegheny County Jail met the necessary requirements.

## Preliminary Hearing

Petitioner's charge that he was not afforded a preliminary hearing is completely without merit. We hold unequivocably that the coroner's inquest conducted on April 8, 1965, met all the requirements of the preliminary hearing as envisaged in Pa. R. Crim. P. 117.

The coroner's office is judicial or ministerial; judicial in the holding of inquests, ministerial when he acts as a substitute for the sheriff.

The office of coroner is today mainly judicial in nature, carrying with it the powers and immunities of a judicial office. In Thomas v. Churton, 2 B. & S. 475 (1862), it was held that judicial immunity attached to the office and relieved the coroner of liability for money damages in an action for slander committed during the course of his official duties.[3]

Being a judicial office, the coroner has the authority to exercise the powers commensurate with such an office. He may issue subpoenas and compel the attendance of witnesses by attachment: The Power of the Coroner to Compel the Attendance of Witnesses, 11 Phila. 387. In the case of homicide, he may commit the offender to jail without bail: Rentschler v. County of Schuylkill, 1 Schuyl. 403, 405 (1880); In Re Coroner's Inquests, 1 Pa. C. C. 14, 3 Kulp 451, 452 (1885); Roberts' Dig. 2d ed. 105; Re Power of Coroner, 11 Phila. 387. He may hold witnesses for contempt for failure to answer pertinent questions (Commonwealth v. Higgins, 5 Kulp 269 (1889); 11 Phila. 387), and punish them by fine or imprisonment. As a judicial officer, he may expel a person from the hearing room without liability when that person interferes with the

---

[3]Cf. Hirko v. Reese, 351 Pa. 238, 40 A. 2d 408, where the court disposed of the trespass action on the merits without considering the question of judicial immunity. See also Frick v. McClelland, 384 Pa. 597, 122 A. 2d 597.

orderly conduct of the hearing: Garnett v. Ferrand, 6 B. & C. 611, 108 Eng. Rep. 576 (1827).

An examination of the historical development of the coroner's office and the specific legislative directives dating back to A. D. 1276, clearly indicates that the office of the coroner is primarily a judicial office designed to protect the public welfare, invested with the powers necessary to compel compliance, including the powers of a committing magistrate.

A careful consideration of the reasons assigned in the motion to quash convinces us that they are all without merit, and, accordingly, an order will be entered dismissing this motion.

### MOTION TO SUPPRESS

We now turn to that portion of the motion to suppress dealing with the allegation that there was an unlawful search and seizure, and an improper arrest made without a warrant.

### THE SEARCH AND SEIZURE

*Discussion of Innkeeper Law*

The question for determination is whether or not the entry of room 933 of the Pittsburgh Hilton Hotel by the Pittsburgh police constituted an illegal entry resulting in the violation of the personal constitutional safeguards afforded this defendant by the Fourteenth Amendment to the Constitution.

It is a well-established common-law principle that hotel keepers or innkeepers are required to accommodate members of the traveling public and to keep their person and possessions safe: Nelson v. Boldt, 180 Fed. 779. A great duty is put upon an innkeeper engaged in the business of providing food and shelter for his wayfaring guest. To fully understand the nature of the innkeeper's responsibility to his guest, it is necessary to look to the responsibilities of the host of the humble village of Medieval England.

"One who undertakes to furnish food, protection and shelter to a wayfaring guest, having undertaken such a public business, considering the public need, the innkeeper must supply his service to all; and in order to perform his undertaking he must furnish not merely sufficient food and a roof, but sufficient protection against the dangers of traveling. To refuse shelter, to fail to provide food or to permit robbers from outside to enter the inn would be a breach of his obligation and would render him liable for damages. But this is not the limit of his obligation. If he provides shelter for a traveler, the innkeeper must undertake his care and protection during the night, not merely against persons outside, but also those inside the inn who might be permitted to break into his room without right": Beale on Innkeepers and Hotels.

The imposition of such a duty on innkeepers implies that they are permitted to set reasonable standards and regulations to be complied with by their guests and thereby subordinate the guest's right to occupy the room to the right of the proprietor of his servants to visit the room and to maintain it in a fit condition or to keep the premises under supervisory control, so that it may not become obnoxious to the proprieties of life or the law of the land. These restrictions are specifically for the protection of the house itself and its patrons: Wolk v. Pittsburgh Hotels Co., 284 Pa. 545; Wellsboro Hotel Company's Appeal, 336 Pa. 171.

Although an innkeeper is not an insurer of his guest's safety, he must use reasonable care to provide for their safety (Ritchey v. Cassone, 296 Pa. 249; Hunter v. Hotel Sylvania Co., 153 Pa. Superior Ct. 591, 34 A. 2d 816), and he has a duty to protect his guest from any drunken and vicious men he may choose to harbor: Rommel v. Schambacher, 120 Pa. 579; Pittsburgh & Connellsville Railroad Co. v. Pillow, 76 Pa. 510.

In this regard, an innkeeper has the right to remove troublesome and obnoxious guests from his house. The rule as stated in McHugh v. Schlosser, 159 Pa. 480, is: ". . . if McHugh was intoxicated, and the disturbances made by him were due to intoxication, he might be treated as a drunken man; but if he was sick, and the disturbances caused by him were due to his sickness, he must be treated with the consideration due to a sick man".

In Raider v. Dixie Inn, 198 Ky. 152, 248 S. W. 229 (1923), the court stated that:

"It appears, therefore, fully settled that an innkeeper may lawfully refuse to entertain objectionable characters, if to do so is calculated to injure his business or to place himself, business, or other guests in a hazardous, uncomfortable, or dangerous situation . . . As a general rule a guest who has been admitted to an inn may afterwards be excluded therefrom by the innkeeper if the guest refuse to pay his bill, or if he becomes obnoxious to the guests by his own fault, is a person of general bad reputation, or has ceased to be a traveler by becoming a resident".

An innkeeper has a duty to accept all who enter his house as guests but in all other respects he has the right to exercise the same control over his inn as he might exercise over his dwelling. He "has an undoubted right to use as much force as may be necessary to eject one whose presence is disagreeable, or dangerous, to himself or his guests": Commonwealth v. Mitchell, 1 Phila. 63 (headnotes).

In this case, the Pittsburgh Hilton Hotel was aware that a dead man was lying on the fourth floor roof surrounded by particles of broken glass and that a window on the ninth floor leading to one of the guest rooms was broken, with venetian blinds protruding outwardly. At this point, it was not known whether the dead man was a guest or a visitor.

In view of the common-law duties imposed upon inn-

keepers, the hotel had not only a right to enter room 933, but a duty to this defendant and to the other guests of the inn to provide for their safety while they slept. At the time of the entry, neither the Pittsburgh police nor the hotel officials knew what caused Alfred Price to plunge to his death. The legality of the entry must be viewed as of that point in time. Whatever may have been the cause of Price's fall, the hotel was under a duty to prevent this defendant and the other guests of the hotel from suffering the same fate.

The personal right of privacy guaranteed by the Fourteenth Amendment is jealously guarded by the law: Mapp v. Ohio, 367 U. S. 643 (1961). And the law owes the individual a duty to protect this right. However, the law owes a superior duty to protect and safeguard the life of the citizenry, in this case the safety and well being of the sleeping guests of the Pittsburgh Hilton Hotel. The law imposed a duty on the innkeepers to protect their guests from robbers and obnoxious individuals and permits them to establish regulations and to supervise the occupancy of their rooms to fulfill that duty.

Surely this right of supervision and regulation, coupled with the duty to protect, includes the right of the innkeeper to enter a hotel room from which a man commenced an uncontrollable flight to his death. It would be strange indeed for the law to sanction the eviction of a drunkard from an inn and at the same time prohibit the innkeeper from taking appropriate steps to preserve the lives of his sleeping guests.

The entry of the Pittsburgh police into room 933 was not a forcible entry. The entry was made with the approval of the hotel management, with their assistance and in their presence. Since the entry by the innkeeper is a justified and legal entry, the entry of the police officers made with the assistance and approval of the innkeeper is also justified and legal.

The Fourteenth Amendment protects against un-

reasonable searches and seizures. Applying this protection to this defendant under the facts of this case, the inescapable conclusion is that his right of privacy "in his castle" has not been violated.

DISCUSSION OF PROPER ENTRIES WITHOUT WARRANTS

Aside from the general principles of the innkeeper law, the circumstances here were so unusual we could reasonably have concluded that the police had a right to enter the room without a search warrant, even had this been an apartment house instead of a public hotel.

In a recent decision, this court, speaking through the writer of this opinion on November 8, 1965, in Commonwealth v. Abraham, 114 Pitts. L. J. 97, 99, 100, declared:

"The general rule is that there may not be an invasion and search of private dwellings by police officers unless they are in possession of a properly executed warrant of arrest and a properly obtained search warrant. Johnson v. United States, 333 U. S. 10. The rationale behind a formidable line of cases is that society chooses to dwell in reasonable security and freedom from surveillance within the privacy of their homes. This right of privacy may reasonably yield to the right of search, but when this right of privacy yields, it must be decided by a judicial officer, and not a policeman or government enforcement agent. In United States v. Lefkowitz, 285 U. S. 452, at 464, the Court declared:

" ' . . . The informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried actions of officers and others who may happen to make arrests. Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime . . .'

"We recall what was said by the man after whom our

county seat was named, William Pitt, Earl of Chatham, on the occasion of the debate in Parliament on searches incident to the enforcement of an excise on cider:

" 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshhold of the ruined tenement!'

"Such is the spirit behind the general rule that no entry without permission may be made into a man's dwelling without proper search warrant.

"The general rule, however, is not without exceptions.

"We now turn to a consideration of whether under the facts presented there were any circumstances present which qualify this entry into the Abraham house as an exception to the general rule.

"In his scholarly dissent in Ker v. California, Mr. Justice Brennan states, at 374 U.S., at page 47:

" 'Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except . . . (2) where the officers are justified in the belief *that persons within are in imminent peril of bodily harm* . . .' (Emphasis supplied)

"In Morrison v. United States, 262 F. 2d 449, the Court (D. C. Circuit) said at page 453:

" '. . . a search of a home without a warrant cannot be based merely on probable cause, that there must be some additional circumstances *reasonably necessitating quick action*'. (Emphasis supplied)

"In Accarino v. United States, 179 F. 2d 456, the Court stated, at page 464:

" '. . . a government official cannot invade a private home, unless . . . (2) an *immediate major crisis* in the performance of duty affords neither time nor oppor-

tunity to apply to a magistrate'. (Emphasis supplied)

"The United States Supreme Court, in Johnson v. United States, 333 U.S. 10, at page 14, declared that there could be 'exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with'.

"Therefore we see that a substantial body of law has been developed which spells out an exception to the general rule: where there is present some additional or exceptional circumstances reasonably necessitating quick action, or where the officers are justified in the belief that a person or persons within the house are in imminent peril of bodily harm, or where an immediate major crisis in the performance of duty affords neither the time nor opportunity for the police to apply to a magistrate".

As we did in Abraham, we now hold that the presence of the dead body on the fourth floor roof, the obviously broken window, the protrusion of the venetian blinds, created circumstances coming precisely within the framework of the above stated exceptions to the general rule.

### Arrest Without A Warrant

We are not impressed by the argument advanced that there was an improper arrest made because defendant was arrested without a warrant.

The law in Pennsylvania is, and has been for a long time, that a police officer is authorized to arrest without a warrant where he has reasonable or probable cause to believe that a felony has been committed, and that the person to be arrested is the one who committed the felony: Draper v. United States, 358 U.S. 307; Ker v. California, 374 U.S. 23; Commonwealth ex rel. Whiting v. Rundle, 414 Pa. 17 (1964); Commonwealth ex rel. Santiago v. Myers, 419 Pa. 326 (November 9, 1965).

The lawfulness of a warrant must be based on probable cause which exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed: Brinegar v. United States, 338 U.S. 160; Commonwealth v. Abraham, supra.

Under the facts presented at the hearing, we hold as a matter of law that there was reasonable cause to believe a felony had been committed (body on subroof, broken window, protruding window blinds, all visible from the outside, and the physical evidence of an altercation inside the room), and that the person arrested was the one who committed it (he was the only one in the room and bore marks on his hands).

Applying all these principles to the instant case, we find that there was no unreasonable search and seizure, and that there was a proper arrest without a warrant.

We, therefore, deny petitioner's prayer to suppress the items of physical evidence obtained from petitioner's person or found in room 933 of the Pittsburgh Hilton Hotel belonging either to petitioner or to the hotel.

## MOTION TO SUPPRESS
### ORAL STATEMENTS OF MARCH 31ST

In the motion to suppress the oral statements of March 31st, we perceive the paramount issue to be whether there was a knowing and intelligent waiver of counsel as required by Commonwealth v. Negri, 419 Pa. 117, which incorporates the holding of U.S.A. ex rel. Russo v. State of New Jersey, 351 F. 2d 429.

There is precedent for what constitutes an intelligent and knowing waiver of counsel at trial.

There are no specific precedents, after Escobedo v. Illinois, 378 U.S. 478, telling us what constitutes such

a waiver at the time of taking a statement by the police.

As in all such cases, we are forced to resolve a conflict between two fundamental interests of society: its interest in prompt and efficient law enforcement, and its interest in preventing the rights of its individual members from being abridged by unconstitutional methods of law enforcement: Spano v. New York, 360 U.S. 315.

We will first examine the cases describing a proper waiver at the trial level.

In Johnson v. Zerbst, 304 U.S. 458, the court declared:

"The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record".

In Carnley v. Cochran, 369 U.S. 506 (1962), the court stated that it is not up to defendant to show that he was unwilling to be tried without counsel. The court declared:

"To cast such a burden on the accused is wholly at war with the standard of proof of waiver of the right to counsel which we laid down in Johnson v. Zerbst, 304 U.S. 464-465:

" 'It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the laws of fundamental rights" ' ".

The court then went on to say that the principles declared in Johnson v. Zerbst are equally applicable to asserted waivers of the right to counsel in State criminal proceedings, and concluded, at page 516:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation in evidence which shows, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver".

In Von Moltke v. Gillies, 332 U.S. 708, Countess Von Moltke came to the country in 1926 and lived in Detroit, where she was a housewife and her husband an instructor in German at Wayne University. On August 24, 1943, between 6 and 7 a.m., six FBI men came to her home and got her out of bed. She was taken to the office of the FBI, fingerprinted, photographed, examined by a physician, taken to the immigrant detention home, placed in solitary confinement, and, with one exception, not permitted to see or communicate with anyone for the next four days. The exception was a permission to call home to give instructions relating to a diabetic child. After being kept in constant custody, on October 7th she went with two of the agents to the Assistant United States Attorney and told him that she wanted to plead guilty. At first, the judge said he would not accept the plea because she had no lawyer and the record before him indicated that she had previously pleaded not guilty under the advice of counsel who was appointed in the courtroom by another judge at a previous appearance in court relating to this matter a few weeks before. But, in response to the judge's question, she said she understood she was voluntarily entering a plea of guilty. The judge then permitted petitioner to sign a written waiver of counsel, in a dialogue lasting five minutes.

The court in considering a habeas corpus reversed and remanded the case on the ground that the defend-

ant did not have counsel and did not intelligently and knowingly waive her right to counsel.

The court pointed out that " 'A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction . . . out of just consideration for persons accused of crime, the courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences' ".

The court quoted Johnson v. Zerbst, excerpts of which we have stated before, and then stated the following, portions of which have been quoted and requoted in a number of recent Pennsylvania cases: [4]

"To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. *To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.* A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered". (Italics supplied.)

The presumption against waiver of the constitutional right of counsel is so strong that the five for-

---

[4] Commonwealth ex rel. McCray v. Rundle, 415 Pa. 65; Commonwealth ex rel. Carter v. Myers, 205 Pa. Superior Ct. 478; Commonwealth v. Myers, 205 Pa. Superior Ct. 409.

midable requirements of Von Moltke must be met at the trial level.

Our precise inquiry, however, is to determine if these same tests must be met at the interrogation level.

In the leading case of United States ex rel. Russo v. State of New Jersey, 351 F. 2d 429, there is only this meager language:

"We can find no effective waiver here. 'The record must show, or there must be an allegation and evidence which show, that the accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S. Ct. 884, 890, 8 L. Ed. 2d 70 (1962) . . ."

In Commonwealth v. Negri, 419 Pa. 117, which is the law of Pennsylvania at the time of this opinion, the court, in holding that Russo must be held to be the law in Pennsylvania until otherwise determined by the United States Supreme Court, paraphrased the holding in Russo to mean:

" . . . no request by the accused is necessary to impose upon the interrogating police the duty to furnish the assistance of counsel in this situation in the absence of a warning to remain silent or an intelligent and understanding waiver". In the issue before us, we must determine what constitutes "an intelligent and understanding waiver" of counsel at a police interrogation level.

There are those who suggest that the same stringent standards relating to waiver at a trial level as set forth in Von Moltke must also apply at the interrogation level.

Crooker v. California, 357 U. S. 433, would not go that far. Here, defendant was a law student, and the court held that he was capable of making an intelligent waiver of counsel at an interrogation level.

Escobedo did not overrule Crooker in *ipsis verbis*, and, in fact, distinguished it from the case before it by saying at page 491:

"(Crooker) does not compel a contrary result. In that case the Court merely rejected the absolute rule sought by petitioner, that 'every state denial of a request to contact counsel (is) an infringement of the constitutional right *without regard to the circumstances of the case.*' Id., at 440".

There are those, however, who suggest that Crooker cannot be reconciled with Escobedo. In a magnificent treatise, "An Historical Argument for the Right to Counsel During Police Interrogation", 73 Yale L. J. 1000, at page 1002, it is suggested that Gideon v. Wainwright, 373 U.S. 355, undercuts the basis of Crooker, and "a reconsideration of that case is now plainly due".

The thesis of the "Counsel at Interrogation", supra, presentation is that in criminal matters a defendant was entitled to the right of counsel, starting even at the time of Coke for matters of law: "Benefit by Counsel in Criminal Cases in the Time of Coke", 6 Miami Law Quarterly 546 (1952). In cases of treason, the court had to appoint counsel by the provisions of the Treason Act, 1695, 7 & 8 Will. 3, c. 3, and a full defense became guaranteed by the Trials for Felony Act, 1836, 6 & 7 Will. 4, c. 114, sec. 1.

In Pennsylvania, the 1682 Frame of Government declared:

"(A)ll persons . . . may . . . personally plead their own cause themselves, or if unable, by their friend ...";  Penn Frame of Gov., Laws Agreed Upon in England, art. VI (1682) ; 5 Thorpe 3060.

This probably granted the Medieval right to counsel, though it is hard to tell when the word "plead" lost its strictly technical significance and took on the modern meaning of "argue".

The 1701 Charter is explicit in its extension of the common law:

"(A)ll criminals shall have the same privileges of witnesses and council (counsel) as their prosecutors": Penn Charter, art. V (1701), 5 Thorpe 3079.

In an act in 1718, the right was further explained:

"Upon all trials of . . . capital crimes . . . learned counsel (shall be) assigned to the prisoners . . . ": 1 Laws of Penna. 134 (Dallas ed., 1797).

The 1776 Constitution granted the right to a hearing in criminal prosecutions by defendant and by his counsel: Declaration of Rights, art. IX, Pennsylvania Const. (1776); 5 Thorpe 3083. It will be remembered, moreover, that granting the right to appointed counsel in all capital cases in the eighteenth century was the equivalent of granting the right in *all felony cases*.

Historically, we have observed that with the introduction of State techniques like interrogation, abuses have appeared. The abuses to which interrogation in England by the magistrates and the star chamber gave rise greatly exceeded the advantages in terms of criminals discovered. The star chamber was abolished in 1641. At the same time, they surrounded the magistrate's hearing with stringent safeguards.

What is important, however, is that when confrontation with the State, the prosecution, occurred at trial, counsel was found necessary, because defendant was intellectually unable and basically unequipped to defend himself.

It must be kept in mind that both English and American criminal procedures, the police process, have changed and undergone fundamental development since 1791 with our Bill of Rights. Where criminal prosecutions were then exclusively private affairs, and the constabulary simply watchmen or jailers, we have seen the subsequent development of vast and powerful forces of police.

These police have consolidated the power of the State behind them and have developed the institution of police interrogation. This development has

made the modern criminal proceeding essentially different from that of the past.

Now, the point at which the individual first confronts the massed power of the State has moved back in process from the trial level to the police investigation, or interrogation level.

It can then be forcefully argued: If the point of confrontation has been pushed back to the police station, and if, historically, an individual is entitled to counsel at the point of confrontation because he is not equipped to match the skill of the State, should not counsel be mandatory at this point?

Professor Arthur Sutherland of Harvard Law School, in "Crime and Confession", 79 Harv. L. Rev. 21 (November 1965), suggests that often the real trial is not in the open courtroom but in a private room in a police station. He observes, at page 31:

"Despite these constitutional and statutory mandates, the process of inquisitorial extraction of self-incriminating statements still goes on; it has only been transferred from Udall's public courtroom [5] of the 1590's to a secluded interrogation room in a modern police station. There police, often aided, advised, and encouraged by public prosecutors, try the suspect in privacy, unhampered by inconvenient constitutional or statutory restrictions which, if they were honored, would give him an 'absolute constitutional right to remain silent,' and right to counsel. Once the suspect has made a prearraignment confession which a court can hold 'voluntary' and an informed renunciation of constitutional rights, *the rest of the judicial trial is largely form*". (Italics supplied.)

Moreover, an extremely forceful argument against waiver of counsel at the interrogation level until all

---

[5] The trial of Mr. John Udall, 1 How. St. Tr. 1271 (1590). Defendant requested counsel, was refused by Judge Clarke, who then, in the presence of the jury, demanded that Rev. Udall confess!

the basic standards of waiver at trial have been met is found in "Counsel at Interrogation", 73 Yale L. J., supra, at page 1042:

"The course of history strongly suggests that only the most extraordinary individual is capable of standing by himself against the power of the state. It has been argued that since interrogation is a passive process from the defendant's point of view and since the defendant need not put forward a defense during interrogation, all that he needs is someone—a policeman or, perhaps, a magistrate—to inform him of his right to remain silent. Of course, even these protections are not presently assured. And there are situations in which silence is not advisable; the accused may be caught in a web of circumstantial evidence which demands explaining, or it may be prudent for him to make some answer to his accusers in order to avoid the possibility that the courts will regard his silence as an 'adoptive admission'. In these situations, the accused needs counsel, to help him decide whether it is advisable to speak and what kind of statement to make".

This is a formidable array of logic and history. We are not convinced, however, that the United States Supreme Court has decided *at this writing*, that in order for there to be an "intelligent and understanding waiver" of counsel *at the interrogation level*, the individual must be in possession of all five of the Von Moltke requirements: (1) Apprehension of the nature of the charges: (2) the statutory offenses included within them: (3) the range of allowable punishments thereunder: (4) possible defenses to the charges and circumstances in mitigation thereof, and (5) "all other facts essential to a broad understanding of the whole matter".

A knowledge of these is essential to waiver of counsel at trial, according to Von Moltke, McCray v. Run-

dle, Carter v. Myers, and McCray v. Myers, supra, but we do not believe this is essential at time of interrogation.

First, the United States Supreme Court just hasn't said so. What it has said in Escobedo, in referring to, and in not overruling Crooker but actually quoting it, was this, at page 491:

"Crooker v. California, 357 U.S. 433, does not compel a contrary result. In that case the Court merely rejected the absolute rule sought by petitioner, that 'every state denial of a request to contact counsel (is) an infringement of the constitutional right *without regard to the circumstances of the case.*' Id. at 440. (Emphasis in the original.) In its place the following rule was announced:

" '(S)tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits . . . *but also if he is deprived of counsel for any part of the pretrial proceedings,* provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of "that fundamental fairness essential to the very concept of justice. . . ." The latter determination necessarily depends upon all the circumstances of the case.' 357 U.S. at 439-440. (Emphasis added.)"

We further observe that since Escobedo was handed down subsequent to Gideon, and the court therein still quoted the "fundamental fairness" test of Crooker which preceded Gideon, we do not agree with those who suggest that Crooker has been overruled.

Secondly, the five factors of Von Moltke presuppose a knowledge of the law possessed by a judge, not by a policeman. It must be remembered that although a policeman is required to have some familiarity with the provisions of The Penal Code, he is neither an assistant district attorney nor a defense counsel. He is not trained in the law. He is not required to know, nor do we believe that even the most experienced mem-

bers of homicide, burglary and robbery squads in fact
do know, for example, "possible defenses to the charges
and circumstances in mitigation thereof" which the
court is required to explain to an individual who de-
sires to proceed to trial without counsel.

It would be added, parenthetically, that in light
of Gideon v. Wainwright, 372 U.S. 335, going to trial
without counsel would only occur where this individual
has refused to accept counsel appointed by the court
and has entered a plea of guilty.

### THE ORAL STATEMENTS OF JAN RONALD GUY

Viewed in this background, we now turn to the in-
stant proceeding. The Commonwealth had the burden
of showing that the accused was advised of his right
to obtain counsel, but intelligently and understand-
ingly rejected the opportunity: Carnley v. Cochran,
supra. In this respect, it offered the testimony of Hom-
icide Detective Stephen F. Tercsak, at page 36:

"I then told him of his rights under the Constitu-
tion. First, that he had the right either to make a
statement or refuse to make a statement. Second, that
if he did make a statement it could be used for or
against him at the trial. And third, he had the right
to be represented by an attorney of his own choice.
He stated at this time that he knows his rights, he
was a former cadet in the United States Military
Academy, and one thing he learned there he was en-
titled to have a lawyer, but he also learned that a man
has to stand up for himself, and calling a lawyer at
this time would only drag out the inevitable, and he
would tell us at this time as best he remembers what
happened".

In his testimony at the hearing, petitioner denied
he was told he had the opportunity to call a lawyer.
He admitted, however, that the detectives very care-
fully explained to him that he had the right to refuse
to answer any questions put to him by them.

In the backdrop of Escobedo, incorporating Crooker, taking into consideration "all the circumstances of the case", and utilizing the standard of "fundamental fairness", we conclude that petitioner did intelligently and understandingly waive the right of counsel.

In Escobedo, at pages 491-92, the court pointed out that Crooker was told of his constitutional right to remain silent, and that "petitioner there, but not here [Danny Escobedo was a 22-year-old Mexican boy] was a well-educated man who had studied criminal law while attending law school for a year".

We feel that the Commonwealth has met the burden of proof. It showed that petitioner had three years at West Point where he studied military law and justice, knew of his right to counsel and was in the possession of both a bachelor's and a master's degree. The court had the opportunity of observing petitioner in court during his testimony and concludes that he is intelligent, knowledgeable and capable of intelligently and knowingly waiving counsel, after admitting he was advised that he had the absolute right to remain silent and the right to refuse to answer any questions put to him.

"Fundamental fairness" considered in the backdrop of "all the circumstances of the case"; these are the polestars to determine whether there has been a deprivation of counsel at a critical stage of the proceedings. These also may be our guides in determining whether there has been an intelligent and knowing waiver of counsel. When we consider "all the circumstances", we must consider that petitioner had a master's degree, had attended West Point, admitted a knowledge of his right to a lawyer, recognized what a lawyer could have advised him to do at this time, specifically to remain silent, and yet knowing all of this, decided to make a statement less than three and a half

hours after his detention; in fact, almost immediately after the interrogation process began. The "circumstances" show the statement was made without delay, with no intervening time for the police to have exercised any mental coercion on this defendant to cloud his mental processes.

The importance of all these circumstances is the fact that the evidence showed petitioner to be intellectually and knowledgeably capable of making this decision, and the utter absence of any coercion, physical or mental.

Accordingly, we shall deny the motion to suppress the oral statement given by petitioner on March 31, 1965, prior to his making the telephone call to his mother requesting her to communicate with Attorney McFall.

### MOTION TO SUPPRESS WRITTEN STATEMENT OF APRIL 1, 1965

Insofar as the written statement of the morning of April 1 is concerned, it must be kept in mind that petitioner called his mother at noon on the day before, that shortly thereafter a call came to the Homicide Squad from Attorney McFall in Texas notifying the detectives that he was representing petitioner, that he requested to speak to petitioner and that this request was refused.

Moreover, and in our view more important, the fact that Attorney McFall had made the call, or calls, was not communicated to petitioner prior to his making the written statement on April 1st, even though detectives were present at the March 31st telephone call to his mother wherein McFall's name was discussed.

We are not called upon to decide what the effect would have been if the fact of the McFall entry into the case had been communicated to defendant prior to his making the written statement. We find as a

fact that he was not told this, and, in our view, this is fatal to the Commonwealth's contention that there was an intelligent and understanding waiver of counsel at this time.

Even if petitioner had the volition to waive the right of counsel at this time, he did not possess the capability to do it, because this crucial fact was known to the detectives, but unknown to him. Without this knowledge, there was neither the intelligence nor the understanding that a waiver requires. One may not knowingly waive that which he does not intelligently know.

The withholding of this information prior to eliciting the written statement from him did violence to "that fundamental fairness essential to the very concept of justice": Escobedo and Crooker, supra.

We will, therefore, sustain the motion to suppress the written statement of April 1st, as well as any oral statements made by petitioner subsequent to the reception of the telephone call by Captain Coon from Attorney McFall on the afternoon of March 31st.

### ORDER

And now, to wit, January 4, 1966, after hearing, and consideration of briefs filed, it is ordered, adjudged and decreed:

1. That the motion to quash the indictments at 3346 and 3347 of 1965 be and the same is hereby denied;

2. That the motion for the suppression of the written statement obtained from petitioner on April 1, 1965, be and the same is hereby granted, and the Commonwealth be and is hereby prohibited from introducing said written statement as evidence at the trial of the within causes;

3. That all other prayers of the petitions filed be and the same are hereby denied.